JOHNS-MANVILLE SALES CORPORATION, Appellant, *v.* PAUL STONE et al., Copartners Doing Business under the Name of STONE CONSTRUCTION CO., Respondents.

First Department, December 17, 1957.

*Gustave A. de Lemos* for appellant.

*Joseph G. Gubman* of counsel (*Shapiro, Gubman & Sitomer,* attorneys), for respondents.

BREITEL, J. Plaintiff appeals from a judgment in favor of defendants, after a nonjury trial, in an action to recover for materials and work, labor and services in the sum of $10,493, representing an unpaid balance.

The work was done under three written contracts, prepared and submitted by defendants. Concededly, the contracts were properly performed by plaintiff and plaintiff is unpaid to the extent of the balance due. Concededly too, the contracts obligated defendants to pay, and, indeed, several payments had been made by checks subscribed by one of defendants.

Nevertheless, defendants succeeded at trial on the ground that they were merely agents for a disclosed principal; that

they were merely supervising contractors and not general contractors for the building construction involved; that the written agreements, prepared by defendants, mistakenly obligated them to pay; and that the owners had never supplied them with funds to pay contractors.

The judgment in favor of defendants should be reversed and judgment granted in favor of plaintiff.

Involved in this case is the construction of a hotel in Las Vegas, Nevada, to bear the name of Moulin Rouge. The owners were a syndicate or limited partnership, of which one Louis Rubin was a member. It was established on the trial that defendants, the Stone partnership, were engaged as supervising contractors for the construction of the hotel. The cost of the entire project was contemplated to be between one and a half and two million dollars. It was also proven that the Rubin group supplied funds for the various contracts to be let, and the money was disbursed out of a special fund by checks countersigned by an agent or member of each of the Stone and Rubin groups, that is, by a designee of the owners and a member of the supervising contractors. All of these arrangements, of course, were among the Rubin and the Stone groups, *inter sese.*

During the construction, a salesman for plaintiff solicited business from defendants, the supervising contractors. The business related to the use and installation of rock cork. Plaintiff then submitted a written proposal addressed to defendants. The negotiating parties agreed, and a written contract was to be prepared by defendants. Asserted by defendants, but contradicted by plaintiff's salesman, is the advising of the salesman that the contract was to be made with the owners — the Rubin group — and not with the Stone group, and the further advice that the Stones were only supervising and not general contractors. As a matter of fact, the testimony was not that the contract was to be made with the Rubin group, but that the Rubin group should be billed.

Be that as it may, defendants instructed a secretary for the owners, who was assisting them, to prepare the contract. She took a printed form, used by a prior general contractor on the job, filled it in, and thus, by the terms of the agreement constituted plaintiff a subcontractor and defendants general contractors with respect to plaintiff. Most importantly, the obligation to pay ran from defendants to plaintiff. Defendants signed the contract and sent it on to plaintiff. Plaintiff checked the credit of defendants, found it good, signed the contract, and proceeded to perform.

In due time, two additional contracts were written for additional work. These followed the pattern of the first. They, too, had been preceded by written proposals, also addressed to defendants. Defendants, by their own instruments, were bound in contract to plaintiff. The mistakes, if they were mistakes, were the same. They were made, in large measure, we are told, by the owners' secretary, who was acting at the behest of defendants. Defendants compounded the mistakes by signing the contracts. Plaintiff accepted all.

In the meantime, as the work progressed, plaintiff rendered invoices to defendants, not to the owners. Again, by mistake of the same secretary, who was serving two masters, the error of invoicing (from defendants' point of view) was called to no one's attention. The invoices were paid, from the fund set up by the owners, but, concededly, with the constitution of which fund plaintiff had nothing to do.

Then something happened. Plaintiff completed its contracts, satisfactorily, but was not paid the balance. When plaintiff pressed defendants for payment, they eventually disowned responsibility, disclaimed the contracts as theirs, and said it was all a mistake. When plaintiff sued, defendants asked for reformation of the contracts to conform with the '' intention '' of the parties, and to substitute the obligation of the owners for that of defendants. Moreover, the owners were never made parties to the action.

The most interesting thing that happened on the trial is that Louis Rubin, one of the owners but a limited partner, testified for defendants. He explained in great detail how defendants were merely supervising contractors, were never paid sufficient to cover subcontracts, and that the intention was always that the owners should contract directly for the work. He conceded that plaintiff had performed its contracts satisfactorily and that the unpaid balance was due, but he did not offer any explanation why plaintiff had not been paid, nor did he suggest that it would be paid.

There is in the record a great deal of detail about signs, inconsistent clauses in the contracts signed, bookkeeping and fiscal practices between the owners and defendants, the nature of the secretary's duties (who acted both for the owners and defendants), and the special fund that had been set up. But all of this, except as to the inconsistent clauses, related to the internal and (insofar as plaintiff is concerned) the private arrangements between the owners and defendants.

Accepting defendants' version of the facts as true, and much of it strains ordinary credulity, plaintiff is entitled to judgment.

Even if it be true that plaintiff's salesman was told that the contracts should be made with the owners (more properly, that the owners should be billed), when defendants sent their own written contract, plaintiff had every right to rely on this as a change of position. When this conduct was repeated with respect to the two additional contracts no doubt remained. And when the earlier invoices were accepted and paid, plaintiff was quite entitled to rest easy. In this context of events, one should keep in mind that the salesman was in the field, and that the documents had been transmitted by defendants to plaintiff directly.

To the plaint that defendants never read the documents they caused to be prepared, there is a simple answer. Even one who fails to read documents prepared by another, in the absence of fraud or other wrongful act by the other contracting party, is conclusively presumed to know its contents and to assent to them, if he signs them. (Metzger v. Ætna Ins. Co., 227 N. Y. 411, 416.)

Nothing in the case, once the documentation came into existence, charged plaintiff with notice of the actual arrangements between the owners and defendants. For the same reason the rule of disclosed principal has no applicability. The question here was not who were the owners. That was clear enough. The question was who were to be the parties to the contracts. That was made clear by the documents and subsequent conduct, and plaintiff had every right to rely on both the documents and the conduct of defendants. Especially in the construction field, it is common for general contractors to make directly the contracts for subsidiary work and materials. This was known to both defendants and plaintiff.

If there was a mistake in this case, it was a unilateral mistake and not a mutual mistake. Nor was it a case of unilateral mistake by one party and fraud on the part of the other, in which equity also interposes to grant relief. (Amend v. Hurley, 293 N. Y. 587.) While there are some cases in which mere unilateral mistake entitles one to equitable relief, then there must be at least a showing of unjust enrichment on the part of the other party. (Rosenblum v. Manufacturers Trust Co., 270 N. Y. 79; 5 Williston on Contracts [rev. ed.], § 1535 et seq., but especially, §§ 1577, 1580; Clark on Equity, § 371; 17 C. J. S., Contracts, § 143.) Not to be confused with the right to reformation is the very much qualified right to rescind, which latter right is obviously not available to or practicable for defendants in this case (Amend v. Hurley, supra).

Similarly, the mere fact that defendants had a disclosed principal is not determinative of the question of their liability. It is a question of intention. (*Mencher* v. *Weiss*, 306 N. Y. 1, 4; *Jones* v. *Gould*, 200 N. Y. 18. Cf. *Meyer* v. *Redmond*, 205 N. Y. 478, 483; *Gordon Malting Co.* v. *Bartels Brewing Co.*, 206 N. Y. 528, 537; see, also, Restatement, Agency, §§ 323, 155; 3 C. J. S., Agency, § 215, subd. b.) Here, the conduct manifested by defendants and the documents emanating from them, indicated unequivocally and objectively an intention to make them parties to the contracts. This was acceptable to plaintiff, regardless of what was told to their field salesman before the first written estimate was submitted or the first oral agreement reached (if in fact it had ever been said). Plaintiff had a right to rely on the manifested assent of defendants. There was nothing unreasonable or unusual about the tendered arrangement, and there was nothing to put plaintiff on notice or confer knowledge that defendants were making a mistake.

With respect to the secretary who acted for both the owners and defendants, again giving credit to defendants' proof, the issue is not who was her employer, but for whom she acted in making out the contracts. In determining that, we look not to the private arrangements between the owners and defendants, or to their unexpressed subjective intention, but to the conduct manifested to plaintiff. To plaintiff, the contracts were prepared by defendants, and it was immaterial to plaintiff to whom this task had been delegated or by virtue of what arrangement.

When one examines the testimony of Mr. Rubin on this subject again, if his testimony be taken on faith, it still does not defeat plaintiff's rights. He, if believed, confirmed the arrangements that subsisted between defendants and the owners. But none of this was binding on plaintiff.

In summary, if we believe defendants' proof, defendants were mistaken and egregious blunders were committed by them and on their behalf. But plaintiff was innocent of mistake, innocent of egregious or any other blunders, and innocent of any knowledge of defendants' mistake. On the other hand, plaintiff is the one that was led — or misled — by defendants, and it should be paid for what it honestly rendered without guile or mistake on its part.

In discussing defendants' proof credibility has been assumed and credit assigned. Before defendants may be granted reformation they must establish their right " *to such relief by clear, positive and convincing evidence.* Reformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error." (*Amend* v.

*Hurley,* 293 N. Y. 587, 595, *supra.*) Actually, the record does not support the assumption or the assignment.* In the light of the documents, the experience of the parties, the subsequent conduct in handling performance under the contracts, it is not possible to accept as established that plaintiff's salesman was told that defendants would not, but that the owners would, contract directly or pay, or that defendants were only supervising contractors. Nor is the testimony of the handling of the invoices and the payments thereon entitled to credit. As for the testimony of Mr. Rubin, most of it is immaterial as a matter of law; but if material, it is not entitled to credit sufficient to overcome the effect of plaintiff's documentary case, or the revelatory impact of the context of events in which this transaction occurred.

Moreover, although plaintiff does not raise the contention, even if defendants' position were entirely substantiated, elementary principles of estoppel would apply to a situation such as arose in this case. There was at best unilateral mistake arising out of gross negligence on the part of defendants, on all of which plaintiff relied, to its detriment.

Accordingly, judgment in favor of defendants should be reversed on the facts and on the law, and judgment granted to plaintiff as requested in its complaint, with costs. Any findings and conclusions made at Trial Term inconsistent herewith

---

* Thus, for example, Mr. Rubin's and defendants' testimony on how they conducted the affairs is highly improbable.

Well over 100 subcontracts were let in the construction of this one and a half to two million dollar hotel. Each of those contracts, similar to the ones here involved, contained a clause stating: "Nothing in this article shall create any obligation on the part of the Owner to pay or to see to the payment of any sum to any Subcontractor" (a clause that would certainly cause plaintiff difficulty were it to sue the owners directly). Notwithstanding this clause and the frequency with which forms containing it were used, Mr. Rubin and defendants stoutly insist that none of them ever read it, or indeed read any substantial part of the printed form they used in conducting their business.

Similarly, it was defendants' job to supervise the construction of the hotel, and, in that connection, to see that no funds were paid to subcontractors until their work had been performed satisfactorily. Nevertheless, defendants testified repeatedly that they never saw even one of the seven invoices sent by plaintiff to defendants, not even on the two separate occasions when, pursuant to these invoices, plaintiff was paid in part with checks countersigned by one of the defendants.

In view of this, little attention need be paid to Mr. Rubin's further assertion that he was present and active in telling plaintiff's field salesman, at a preliminary demonstration, that the owners — and not defendants — were to be billed for the work, for which no proposals and no contracts had yet been drawn or tendered.

should be reversed, and the findings and conclusions contained herein substituted therefor.

Peck, P. J., Rabin, Frank and McNally JJ., concur.

Judgment unanimously reversed on the facts and on the law, and judgment granted to plaintiff as requested in its complaint, with costs. Any findings and conclusions made at Trial Term inconsistent herewith are reversed, and the findings and conclusions contained in the opinion of Mr. Justice Breitel substituted therefor. Settle order.