JAMAICA SAV. BANK v. TAYLOR et al.

(Supreme Court, Appellate Division, Second Department. May 29, 1902.)

1. VENDOR AND PURCHASER—CONTRACT—DESCRIPTION—MISTAKE—EVIDENCE—REASONABLE DOUBT.
    In a suit to reform a contract for the sale of land because of mistake, in that it does not describe the land intended to be conveyed, it is not requisite to relief that the evidence should show the mistake beyond a reasonable doubt.

2. SAME—EVIDENCE—SUFFICIENCY.
    Evidence in an action by a vendor to reform a contract for the sale of land, as containing, by mistake, a description of a larger body of land than was intended to be conveyed, considered, and held to show a mistake of the scrivener, warranting the reformation prayed.

3. SAME—FAILURE TO READ CONTRACT.
    Where, on the making of a contract for the sale of land, a wrong description, owing to a mistake of the scrivener, is given in the written agreement, the seller may have reformation, though he did not read over the instrument after it was drawn.

4. SAME—INNOCENT PURCHASER FROM VENDEE.
    Where a contract for the sale of land, owing to a mistake of the scrivener, describes a larger tract than intended, the seller may have reformation against a purchaser for value and in good faith of the vendee's rights, in the absence of any conduct on the part of the vendor calculated to mislead the vendee.

Appeal from special term, Nassau county.

Action by the Jamaica Savings Bank against Harry Taylor and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Edward L. Frost, for appellants.
Ralph Stout, for respondent.

JENKS, J.   The court, having found that the scrivener, in reducing the contract to writing, wrote a description which embraced land not within the contract, and that the contract as written was thereupon executed by the parties in ignorance, adjudged reformation for mutual mistake.   The learned counsel for the appellant seems to insist that the evidence which justifies such relief must be beyond a reasonable doubt, inasmuch as he quotes from the opinion in Coast v. McCaffery, 46 App. Div. 436, 61 N. Y. Supp. 881:

"Courts are chary in reforming written contracts.   The doctrine is thus stated in 2 Pom. Eq. Jur. (2d Ed.) § 859: 'The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing,—in the language of some judges, the strongest possible,—or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a *reasonable doubt.*'"

As the paragraph is a quotation by the learned justice from Pomeroy's Equity Jurisprudence, which is immediately followed by a quotation from Christopher & T. St. R. Co. v. Twenty-Third St. Ry. Co., 149 N. Y. 51, 58, 43 N. E. 538, that the proof must be of the most substantial and convincing character, I take it that the learned justice did not intend to state a rule in the language of Pomeroy, thus italicized by the learned counsel, but meant to adhere to that indicated by Martin, J., in Christopher & T. St. R. Co.'s Case, supra, inasmuch as the authorities in this state do not require that the proof should be beyond a reasonable doubt.   For Parker, J., in Southard v. Curley, 134 N. Y. 148, 31 N. E. 330, 16 L. R. A. 561, 30 Am. St. Rep. 642, considers this precise question, and, after an exhaustive review of more than a score of cases, concludes that:

"They do not require us to declare that this strong rule of criminal procedure has become a part of the practice in civil actions.   Certainly, this need not be done in view of the many authorities which, before and since Judge Story penned the rule that 'relief will be granted in cases of written instruments only when there is a plain mistake clearly made out by satisfactory proofs,' have asserted the same doctrine in terms or in substance."

Southard v. Curley, supra, is cited among the multitude of cases referred to by Martin, J., in Christopher & T. St. R. Co.'s Case, supra, who concludes, ut supra, that the proof "must be of the most substantial and convincing character."   It is true that this court, in Weed v. Whitehead, 1 App. Div. 192, 37 N. Y. Supp. 178, said that there must be "certainty of error," but the entire sentence reads, "Courts of equity do not grant the remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of error," and Southard v. Curley, supra, is cited as authority.

Certain circumstances established beyond cavil make for the plaintiff, in that they may afford an explanation of the reason for the mistake, and corroborate the version of the plaintiff.   The description, as written, covers a tract of land acquired by the plaintiff through foreclosure of a mortgage, and that description conforms to the deed of the referee executed therein.   After the plaintiff acquired title, the plaintiff divided the land into two parcels, which are described as the corner plot and the inner plot, respectively.   Plaintiff's banking house was in Jamaica, and the land was situate

at Lawrence, in the town of Hempstead, Nassau county, where the defendant lived. There were buildings on each parcel. The larger house, on the inner parcel, remained in the occupancy of Mrs. Mimnaugh, the former owner of the entire tract; and the smaller house, on the corner parcel, was let to the defendant Taylor. The lands were in charge of the treasurer of the plaintiff, who had made the said defendant an agent for the sale of the two parcels, and all negotiations prior to the day of the execution of the written contract were had between him and the defendant. On that day, Taylor met the treasurer, who was about to take a journey, at the railway station in Jamacia. After some conversation, the treasurer referred Taylor to the secretary of the plaintiff at its banking house, and there Taylor was referred to the president of the plaintiff, who was also the county clerk of Queens county. After some conversation between the president, the secretary, and Taylor, the president directed a confidential clerk in the county clerk's office to prepare a contract, and gave to him, as data, the said referee's deed, and a diagram of the property. The clerk drew the contract, and thereafter the president and Taylor executed it. The premises were mortgaged for $12,000, and were bought in at foreclosure sale in April, 1900, for $10,000. In November, 1900, the plaintiff wrote to Taylor that he might offer the corner lot for sale at $7,500, and the inner plot at $12,000, or the entire tract to one purchaser for $19,000, one-half in cash, and one-half on mortgage for either sale. On November 27th Taylor wrote to the plaintiff that he thought the price was low enough, and that he could sell the property during the coming year at that price, and that he had received an estimate on the property at $17,000. On December 17, 1900, the plaintiff, reviewing the prices, wrote an authority to Taylor to sell the corner plot for $6,500, and the inner plot for $9,500, in cash. Taylor, on cross-examination, states that the lowest price named by the bank prior to the contract was $19,000. It appears on the record without objection that the previous owner of the premises stated that the buildings thereon alone cost $19,500.

I now consider the testimony adduced by the plaintiff as to the contract made between it and the defendant: The treasurer of the plaintiff states that shortly after December 17, 1900, Taylor told him that he had a purchaser, but, as the purchaser wished to remain unknown, Taylor asked for a contract running to him, and that Taylor, expressing dissatisfaction with his commission, asked that it might be fixed at any excess over $6,500 which he might obtain, whereupon the bank agreed, and made a contract with Taylor in his own name. Two or three days thereafter, when the treasurer met Taylor at the railway station, as narrated, Taylor said that he had come to make a contract, as he had sold the little house on the corner for $6,800. The treasurer, who had been called away on business, told Taylor to go to the bank, whence the secretary would take him to the president, who would prepare the contract. The secretary testifies that Taylor came to the bank and asked for the president, whereupon he was referred to the county clerk's office. The president returned with Taylor to the bank, and asked the sec-

retary if he knew of the agreement. The secretary answered that the treasurer had told him, and thereupon the president asked for the papers, and departed with Taylor. The secretary looked up the map and the referee's deed, and took them to the county clerk's office. There Taylor told him that he was to purchase the small house for $6,800, and the secretary said that his understanding was that the bank was to take $6,500, and Taylor $300 as his commission. Taylor confirmed this, and he and the secretary then went to the president. The secretary "described" the property to the president, pointing out the corner lot. Taylor admitted that that was the plot in question, and then paid $680 to the secretary. The president testifies that he had never met Taylor before the occasion named; that he had no previous knowledge of the contract, beyond a general knowledge that the treasurer, who had entire charge, was selling off the realty; and that he acted on account of the necessary absence of the treasurer. He states that the substance of the interview between the secretary, Taylor, and himself was that Taylor had bought the corner lot; that Taylor designated the corner plot on a map which was then produced; that he then called his clerk, showed him that particular lot, told him to prepare the contract; and that after this was done, upon the assurance of such scrivener, he signed the contract without reading the description therein contained. He states that he had no authority whatever to sell the property described therein for $6,800. The scrivener, who was an index clerk in the county clerk's office, testifies that he was called in and directed to prepare a contract for the corner piece of property, and that at the time Taylor sat, possibly, within three or four feet of him. The referee's deed and the map were given to him. He had in mind that the referee's deed contained a proper description of the corner lot, and he used that description, instead of making one from the map. Previous to the execution the scrivener asked Taylor why he was buying the corner place, and asked him if he knew it, and Taylor said, "I certainly do," pointed it out, and said, "It is the place I am living on, with the barn attached."

Opposed to this evidence is the testimony of Taylor alone, whose version is that he was referred to the president as the only man who could fix the price; that he then called upon the president, and said that he had "come to buy the Mimnaugh property, if I could get it anywhere near my price. He asked what I was in position to offer him. I told him. He said he would accept the offer. I told him $6,800. He said he would send in for the deed, and have the contract made out." He admits that in that interview between him and the president, theretofore strangers, the president, having asked him what he could give, "very accommodatingly came down" to $6,800 for the entire property, or, in other words, acting for his bank, he reduced the price, offhand, from $16,000 or $17,000 to $6,800. His own comment is striking: "It was a terrible drop, I thought." The testimony of the defendant, as given, is unsatisfactory, inconsistent, and inherently improbable. It strikes one as the flimsy fabrication of afterthought. The plaintiff's case, then, shows a banking institution which within a year, and at a forced sale, had bought the premises for $10,000, which

it had thereafter offered for sale through the defendant at $19,000,—a price which seemed low enough to the defendant, who had had them appraised at $17,000. The price named to Taylor but three days before the day of the contract was $16,000 in cash,—$6,500 for the corner plot, and the balance for the inner plot. The treasurer, the secretary and the president of the plaintiff, and the scrivener, all testified that the contract actually made contemplated the purchase of the corner lot only. A contract having been made, a scrivener is called in, and is furnished as data for the contract the referee's deed, which embraces in one description the entire tract and a diagram. This scrivener writes the contract, and inserts the description from the deed, disregarding the diagram, and names the consideration at $6,800, which is but $300 in excess of the sum fixed by the plaintiff in its letter to Taylor, written but three days before, as the cash price for the corner lot alone; the price of the remainder of the tract being stated at $9,500. The $300 represented Taylor's commission. The defendant's case shows that within three days after the letter fixing the prices as stated was received by him, and although admittedly the bank never reduced the price, he called, as a perfect stranger, upon the president, who, almost offhand, after the inquiry as to what Taylor could give, accepted an offer of $6,800 for the entire tract, thereby reducing the cash price named but three days before by more than $9,000. There is no suggestion that the bank was in any financial straits, or that there was reason for a sacrifice or a benefaction. I think that the learned special term (Gaynor, J.) was right in its decision that there was an error of description due to the scrivener; that reformation was but conformation to the contract actually made, and was properly adjudged. Born v. Schrenkeisen, 110 N. Y. 55, 17 N. E. 339; Linton v. Fireworks Co., 128 N. Y. 672, 28 N. E. 580; Gillespie v. Moon, 2 Johns. Ch. 586, 7 Am. Dec. 559; Kerr, Fraud & M. 418; Canedy v. Marcy, 13 Gray, 373; Stines v. Hays, 36 N. J. Eq. 364.

I have said that the version of the defendant was uncorroborated. There is, however, a single exception. He testifies that he took the contracts, read them over separately, and compared them with the diagram; and the scrivener says that the defendant did read the description aloud in his presence inside the main office. But this cannot avail the defendant if the plaintiff's proof establishes that the contract, as actually made between the parties, was for the purchase of the corner lot alone at $6,800. If the truth is, as the court has found, that the actual contract contemplated the corner property only, and yet it is also proved that the defendant read over the erroneous description, one of two conclusions follows, neither of which affects the right of the plaintiff: Either, reading it, the defendant did not understand, but supposed the description expressed the truth, or he did understand, and knew that the contract did not express the truth. In the latter case he stands as one who knowingly sought to overreach his fellow by securing a written contract which did not express the true agreement, and thereby to gain an unconscionable advantage, and he is liable to this action for a reformation. Kilmer v. Smith, 77 N. Y. 226, 231, 33 Am. Rep. 613; Curtis v. Albee, 167 N. Y. 360, 364, 60

N. E. 660; Avery v. Society, 117 N. Y. 451, 23 N. E. 3; Stines v. Hays, 36 N. J. Eq. 369. .

It is said that the omission of the president to read the description precludes the plaintiff from any relief. In Institution v. Burdick, 87 N. Y. 40, 46, the court say:

"We are also constrained to differ from the learned general term. The doctrine laid down by this court in Long v. Warren, 68 N. Y. 426, has never before in this state, and very rarely elsewhere, been applied to a case like this. Indeed, in most of the cases to be found in the books where relief has been sought against written instruments on the ground of mistake and fraud, the complaining parties were chargeable with the same kind of negligence which exists in this case, to wit, the omission to read or understand the contents of instruments executed or accepted. It has certainly never been announced as the law of this state that the mere omission to read or know the contents of a written instrument should bar any relief by way of a reformation of the instrument on account of mistake or fraud. It is the general rule that where a written instrument fails to conform to the agreement between the parties in consequence of the mutual mistake of the parties, however induced, or the mistake of one party and the fraud of the other, a court will reform the instrument so as to make it conform to the actual agreement between the parties."

See, too, Smith v. Smith, 134 N. Y. 62, 31 N. E. 258, 30 Am. St. Rep. 617. I now consider the relation of the defendant Eldert, who answers that on or about December 21, 1900, Taylor exhibited to him the contract, dated December 20, 1900, and that he became the innocent purchaser thereof for $1,680; that thereupon Taylor executed an assignment to him; and that he paid $1,000, the balance being payable upon the delivery of the deed. The learned court found that the consideration was not paid; that Eldert was not a bona fide purchaser, but had knowledge of the mistake, and was privy to it. But even if the evidence failed to establish that Eldert was privy to the mistake, and did not pay any consideration for his assignment, or, in other words, that he took the assignment innocently and for a valuable consideration, the status of Eldert would not affect the relief afforded by the judgment. Taylor assigned to Eldert his agreement, and all his rights, title, and interest of, in, and to the same; and Eldert is entitled exactly to the interest which Taylor took, and nothing more. When the court of equity finds that, in order to express the true contract, there must be a reformation of the written agreement, I think that there is no principle of law which permits Eldert to hold the plaintiff to the terms of the unreformed contract. The contract was not a negotiable instrument, and does not fall within the doctrine which protects a bona fide purchaser thereof for a valuable consideration. In Reeves v. Kimball, 40 N. Y. 299, Woodruff, J., regarded such a contract as a mere chose in action. The principle which applies is that Eldert, as the assignee, takes subject to all of the equities against Taylor, his assignor. Girard, Tit. Real Est.; Reeves v. Kimball, 40 N. Y. 299; Schafer v. Reilly, 50 N. Y. 61, 67; Murray v. Lylburn, 2 Johns. Ch. 441; Central Trust Co. v. West India Imp. Co., 169 N. Y. 324, 62 N. E. 387, et seq; Bigelow, Frauds, 454; Cutts v. Guild, 57 N. Y. 229, 233; Warv. Vend. § 66; Story, Eq. Jur. 179. If the plaintiff either had done or had omitted to do aught in the premises which had misled Eldert, or which might reasonably have been taken

by him as a further assurance, then a question based upon the princi-
ples of equitable estoppel might be presented in his case. But unless
there was proof of such conduct on the part of the plaintiff, I think
that the assignee cannot prevail as against this plaintiff, seeking
reformation. Reeves v. Kimball, 40 N. Y. 311. Whatever Eldert's
remedy may be as against Taylor, it is sufficient to determine upon
this appeal that he has no rights that can defeat this action.

The judgment should be affirmed, with costs. All concur.