Ellen P. Surlak, Appellant, v Joseph E. Surlak, Respondent.

Second Department, September 12, 1983

APPEARANCES OF COUNSEL

*O'Rourke & Lo Casio* (*Andrew O'Rourke* of counsel), for appellant.

*Ashley, Lewittes & Burton* (*Alvin Ashley* of counsel), for respondent.

OPINION OF THE COURT

Gibbons, J.

We are called on in this appeal to review the propriety of a determination that a portion of the separation agreement between the parties, which provides for monthly payments from the husband to the wife, should be voided. We conclude that the record does not support impeachment of the agreement and that, therefore, judicial intervention to alter the agreement is improper.

## I

The parties were married in 1959. They have two children: Linda, born on March 8, 1960, and Robert, born on March 7, 1961. On May 22, 1973, they entered into a separation agreement. The NINTH paragraph of the agreement, which is at the center of the controversy between the parties, states: "The husband agrees to pay to the wife for the support and alimoney [sic] the sum of Six Hundred ($600.00) Dollars per month, recognizing that his income presently prevent [sic] him from paying more."

Although the defendant husband was not represented by counsel at the time of the execution of the agreement, there is some indication that prior to signing it he showed it to an attorney. Admittedly, defendant, a career police officer and a detective since 1965, showed the agreement to various friends of his who are attorneys, shortly after signing it. He also consulted a tax service and, as a result of advice received, claimed the $600 monthly payment as alimony for income tax deduction purposes from 1973 up to and including 1980. At an examination before trial, defendant acknowledged that plaintiff's attorney had never suggested that he was representing both husband and wife, but had always maintained that he was only representing the wife. Defendant was also told that he had a right to have an attorney of his own. Defendant testified at the trial that, prior to signing the agreement, he "glanced" at the document and the paragraph containing the payment obligation. He also acknowledged that, as of the summer of 1973, he interpreted the NINTH paragraph of the agreement to mean that he was obligated to pay alimony or payments to the plaintiff wife for the rest of her natural days. At no time did defendant institute an action to reform or rescind the agreement.

The two children left home and were emancipated between 1977 and 1979. In July of 1978, defendant, on the advice of his present counsel, stopped making any payments to plaintiff. According to defendant he began putting the $600 monthly sum into a bank account "using my name and both children as beneficiaries * * * I consider it a trust fund or whatever". He continued to take tax deduc-

tions for alimony payments for the years 1978, 1979 and 1980.

Plaintiff wife brought this action for a money judgment, based on the separation agreement. As revealed by the trial testimony, the dispute between the parties centers on the NINTH paragraph of the agreement. The defendant testified that when he discussed the $600 figure with his wife, prior to signing the agreement, it was solely for the purpose of the "maintenance of the children and the up-keep of the house", and not for the purpose of maintaining plaintiff. According to defendant, the only thing discussed was the sum of money to be paid for the house and the children, with no allocation between the two. Defendant stated that while he was aware, by the sum of 1973, that the NINTH paragraph had no provisions for reduction or termination of payments, he "had it in [his] mind that [he] was going to stop once the kids were eighteen".

Plaintiff claims that the $600 sum was intended to aid her in paying for all the household expenses, including the mortgage, her expenses and those of the children. The marital home is owned by the parties as tenants by the entirety. Plaintiff maintains that the sum was not allo-cated between alimony and child support, nor was the sum to be reduced when the children became adults, because it was anticipated that plaintiff's needs and the household expenses would, in fact, continue to grow past the time the children reached majority. According to plaintiff, she asked for a cost-of-living increase, but defendant refused, stating that "[i]t will all even out as the years go by". From this discussion, plaintiff came to the conclusion that defen-dant understood and agreed that the $600 sum was to continue after the children left home.

The case was tried on January 28, 1981, without a jury. The trial court found "that the parties agreed on the sum of $600 a month. The question of the support of the children and the expenses of the house are certainly a vital part of the discussion between the parties. At no time did either of them speak specifically to each other in terms of the payment to the wife for herself, for her personal support after the children were gone or after the marriage was terminated".

The court granted plaintiff a judgment for arrears, running from July of 1978 up through the month of the trial, January of 1981. This portion of the decision was premised on the court's view that defendant could not be relieved of "past payments" because of his failure to bring an action "to annul or void the agreement", "the fact that the defendant did go to see counsel; and that a number of years went by in which the payments were made and he accepted the benefits [for tax purposes] of unallocated payments".

Despite this reasoning, the court annulled the NINTH paragraph, commencing February 1, 1981. The court stated the basis of this decision, as follows: "However, with respect to the agreement itself, the answer that is before this Court sufficiently recites enough of the mistake on the part of the plaintiff [sic] to permit the Court to relieve him, under the circumstances, of the continuing obligations of the agreement with respect to support payments. The language does say 'support and alimony'. It therefore contemplated, to some extent, support of the children and alimony of the wife without allocation. The Court is unable to divide that sum of money and rewrite the agreement. Under the circumstance that the children have left, it is clear that the lack of a provision for allocation makes necessary the intervention of the Court, not for the purpose of rewriting, but only to annul a specific portion. I do not annul any other part of the agreement."

## II

Plaintiff appeals from so much of the judgment as annulled the NINTH paragraph of the agreement. Her primary contention is that the trial court exceeded its authority by modifying a separation agreement to which both parties had assented. Defendant argues that the trial court "interpreted the Agreement and intention of the parties to make provision for child support for their children, and not alimony for the wife", and that, therefore, since the children are emancipated, no further payments are required by the terms of the agreement. Alternatively, defendant maintains that the trial court properly exercised its equitable powers to rescind a portion of the agreement.

It clearly is not the case that the trial court interpreted the agreement as only allowing for child support, exclud-

ing alimony. The court specifically held that the inclusion of the terms "support and alimony" in the agreement shows that the parties "contemplated, to some extent, support of the children and alimony of the wife without allocation". This conclusion is sound. As with other contracts, when the terms of a separation agreement are clear and unambiguous, the general rule is that the intent of the parties is to be found within the four corners of the agreement (*Nichols v Nichols,* 306 NY 490, 496). "It is only on the determination of the meaning of an indefinite or ambiguous contract that the construction placed upon the contract by the parties themselves * * * is to be considered by the court and is of importance in ascertaining the contract meaning" (*Matter of Robinson v Robinson,* 81 AD2d 1028, 1029; see *Dobbins v Dobbins,* 59 AD2d 548).

The NINTH paragraph refers to "support *and alimoney* [*sic*]" (emphasis supplied). The meaning of the word "alimony" is unambiguous, being understood in both the lexicons of the legal world and of the general public as support for the spouse or former spouse, generally the wife (see, e.g., *Gaines v Jacobsen,* 308 NY 218, 223; Webster's Third New International Dictionary, p 53). That the reference to alimony in the NINTH paragraph bears this meaning is confirmed in the FOURTH paragraph of the agreement, which reads, in part, as follows: "FOURTH: In the event that a temporary or interlocutory of [*sic*] final judgment, order of decree of divorce shall be rendered in any action or proceeding between the parties hereto, such judgment, decree or order shall make no provision for the maintenance of the wife except according to the terms of this agreement, and such portions of this agreement as relate *to maintenance of the wife* shall be embodied" (emphasis supplied). It is patently clear that, at least, a portion of the $600 monthly sum was intended for plaintiff's benefit.

Nor may it be said that the agreement is ambiguous on the issue of the reduction or termination of payments to be made when the children reached majority or became emancipated, so as to justify a possible inference from the parties' conduct and the surrounding circumstances that payments were, in fact, intended to cease when either of such events occurred. It has repeatedly been held that

where a separation agreement provides for an unallocated monthly alimony and child support payment, that payment, generally, may only be reduced or terminated on conditions expressed in the agreement (*Rehill v Rehill*, 306 NY 126, 133; *Nichols v Nichols, supra,* pp 497-498; *Mitchell v Mitchell*, 82 AD2d 849; *Smith v Smith*, 80 AD2d 749; *Null v Null*, 68 AD2d 883; *Stern v Stern*, 41 AD2d 676, mot for lv to app dsmd 32 NY2d 704; *Olmstead v Olmstead*, 24 AD2d 605, affd 18 NY2d 652). Terms or conditions for reduction or termination of such payments, relating to the status of the children, should not be implied or deemed to exist (*Null v Null, supra*). The simple answer to defendant's contention that the parties intended that the payments were to be "for child support. only, and that the defendant had no obligation therefor after the children were emancipated" is "that the separation agreement contains no such provision" (*Rehill v Rehill, supra,* p 133; see, also, *Nichols v Nichols, supra; Stern v Stern, supra*). Since the agreement in this case contains no provision for terminating or reducing the monthly payment after the children's emancipation, it must be concluded that the termination of the payments was contrary to the separation agreement entered into by the parties.

Our dissenting colleagues maintain that because "[t]he statutory obligation of child support terminates upon emancipation * * * [a]n express provision terminating the undertaking upon emancipation would be superfluous". Such is not the case, if for no other reason than that parents can assume support obligations beyond those mandated by statute (*Streuli v Streuli*, 60 AD2d 829). More on point is the fact that in several of the above-cited cases (*Rehill v Rehill, supra; Mitchell v Mitchell, supra; Smith v Smith, supra; Olmstead v Olmstead, supra*), the argument was made that unallocated provisions for support and alimony should be reduced as the children involved reached majority or were emancipated, despite the absence of clauses so providing. The courts refused to accept this argument. While it appears to be true that a specific allocation for child support will generally be interpreted to cease in its operation upon the children reaching majority, unless the agreement explicitly provides otherwise (see 2

Foster-Freed, Law and the Family, § 28:48; *Reynolds v Reynolds,* 71 AD2d 837), that is not true with a unitary and unallocated provision for a wife's and children's support (*McMullan v McMullan,* 51 AD2d 771).

The dissent also maintains that the courts in *Nichols* (*supra*) and *Rehill* (*supra*), and the other cited cases "merely concluded that the express inclusion of some contingency terms logically excluded their finding of any additional unexpressed terms". Apparently, the holdings in these cases are seen by the dissent as nothing more than applications of the maxim of contract interpretation *"expressio unius est exclusio alterius"*, that is, "the expression in a contract of one or more things of a class implies the exclusion of all not expressed" (17A CJS, Contracts, § 312, p 172). However, none of the cases state that this rule of construction was the basis for its holding. Rather, the basis for the holding in *Rehill* (*supra*) and the other cited cases, with respect to unallocated provisions of support and alimony, is expressed in *Nichols* (*supra,* p 497): "[T]he courts have enforced the contract as written and refused to do what the parties had failed to do, that is, apportion the total sum". Illustrative is *Cogswell v Cogswell* (130 Misc 541), cited and discussed in *Nichols* (*supra,* p 497) with approval. The relevant provision in the separation agreement in *Cogswell* was silent with regard to reductions or termination. The Court of Appeals, in *Nichols,* summed up the *Cogswell* holding as follows (p 497): "The couple [in *Cogswell*] had three children and all three were actually living with their father but the court found it impossible to reduce the husband's obligation, since that suit, like the present one, was at law on an indivisible promise to pay, not subject to modification by a court".

The case of *Olmstead v Olmstead* (282 App Div 946, 24 AD2d 605, affd 18 NY2d 652, *supra*) is also illustrative. The record reveals that the parties were married on August 2, 1929. Their first daughter was born on December 7, 1939, and the second was born on July 29, 1942. In 1946 the parties entered into a separation agreement which provided that Mr. Olmstead, an attorney, would pay $95 twice every month "for the support and maintenance of the said wife and the two said children", and that either party

could apply for a modification of the allowance in the event of a change in "the present ability of the husband to pay and the minimum needs and requirements of the wife and the children". It does not appear that the agreement mentioned any other contingencies of reduction or termination.

In 1951 the wife sought to recover sums allegedly due under the agreement. At that time, she no longer had custody of the two children, who had gone to live with the father by consent of both parties. The official referee, to whom the action was referred, directed the dismissal of the complaint. This court affirmed the referee's determination, in a decision released shortly prior to the Court of Appeals holding in *Rehill* (*supra*), as follows: "The agreement provided for payment to appellant [wife] of a single sum periodically for support of herself and the two children of the parties. The children were not living with appellant, or being cared for by her, in the extended period of time during which respondent made no payments to her. The court may not award her a portion of the agreed amount. That would be tantamount to making a new agreement for the parties, which the court may not do" (*Olmstead v Olmstead*, 282 App Div 946, *supra*). Thus, as the trial court did in this case, we effectively rescinded that portion of the agreement between the Olmsteads as required the husband to make payments to the wife, believing that any other decision would require an improper modification of the contract.

After the decision in this court, Mr. Olmstead, nevertheless, commenced making payments to his wife and continued doing so until the spring of 1961. The record of the case does not reveal whether the children moved back with their mother or not during this time. In any event, in March, 1962, the wife brought an action to recover arrears dating from April of 1961. The action was dismissed by the Supreme Court, the Justice citing the afore-mentioned 1953 decision of this court. On appeal, we briefly reviewed our prior decision and then declared "that determination was incorrect in the light of later decisions by the Court of Appeals (*Nichols* v. *Nichols,* 306 N.Y. 490) * * * The fact that the children were with defendant during the period in question is immaterial (*Nichols* v. *Nichols, supra*). The fact

that the older of the two daughters had attained her majority on December 7, 1957 is likewise immaterial (*Rehill* v. *Rehill,* 306 N.Y. 126)" (*Olmstead v Olmstead,* 24 AD2d 605, *supra*). We went on to hold that a trial was necessary on the question, not at issue in this case, of whether, during the period in which the defendant had been making payments to the plaintiff, the latter had, through her own fault, failed to support the children, thereby possibly resulting in a breach of her obligations under the separation agreement.

In sum, we can only conclude, following *Rehill* (*supra*) and like cases, that the NINTH paragraph of the agreement involved here is unambiguous, providing for a fixed, unallocated sum of money for support and alimony to be paid to the wife on a monthly basis. Since the agreement does not provide for either payment reductions or a termination of this obligation resulting from the emancipation or coming of age of the parties' children, it must be concluded that, under the agreement as written, such an event had no bearing.

### III

The trial court attempted to avoid the inexorable demands of the separation agreement by holding that "the answer that is before this Court sufficiently recites enough of the mistake on the part of the plaintiff [*sic*] to permit the Court to relieve him, under the circumstances, of the continuing obligations of the agreement with respect to support payments". While the trial court did not use either term, apparently, it was of the opinion that this case presented an appropriate opportunity for the exercise of judicial intervention in the form of either rescission or reformation. We conclude, however, that while rescission or reformation might be applicable in other circumstances to relieve an obligor from an unallocated payment provision contained in a separation agreement (see *Rehill v Rehill,* 306 NY 126, 134-135, *supra*), these doctrines have no application here.

"Under long accepted principles one who signs a document is, absent fraud or other wrongful act of the other contracting party, bound by its contents" (*Da Silva v Musso,* 53 NY2d 543, 550). That principle, which is per-

haps essential if there is to be a law of contracts, is applicable to separation agreements. "Generally, separation agreements which are regular on their face are binding on the parties, unless and until they are put aside * * * Judicial review is to be exercised circumspectly, sparingly and with a persisting view to the encouragement of parties settling their own differences in connection with the negotiation of property settlement provisions" (*Christian v Christian,* 42 NY2d 63, 71-72). "So long as a separation agreement stands unimpeached, the court cannot alter or change a provision for separate maintenance and support of the wife without the consent of both parties" (*Leffler v Leffler,* 50 AD2d 93, 95, affd 40 NY2d 1036).

As with other contracts, a separation agreement can be impeached through the equitable doctrines of reformation or rescission. A claim for reformation, generally, must be based on an allegation of mutual mistake or fraudulently induced, unilateral mistake (*Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211). Where such exists, "the court under appropriate circumstances is justified in reforming the contract so as to make it conform to the agreement actually made and intended" (*Leffler v Leffler, supra,* p 95). Rescission, on the other hand, is usually only applicable where, because of fraud, misrepresentation, or mistake, "there is an absence of the requisite 'meeting of the minds' to the contract", and then all or a part of the contract will be annulled (*Brauer v Central Trust Co.,* 77 AD2d 239, 243).

As afore-mentioned rescission and reformation are remedies which may be sought with regard to separation agreements, as with other contracts. However, separation agreements are unique insofar as they involve a fiduciary relationship existing between spouses. The sanctity of the marriage relationship requires "the utmost of good faith", and, because of it, "a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract" (*Christian v Christian,* 42 NY2d 63, 72, *supra*). In particular "[t]o warrant equity's intervention [with respect to a separation agreement], no actual fraud need be shown, for relief will be granted if the settlement is manifestly unfair to a spouse because of the other's over-

reaching * * * in its execution" (*Christian v Christian, supra,* pp 72-73; see *Levine v Levine,* 56 NY2d 42, 47). Thus, the circumspect and sparing nature of judicial review of a separation agreement must be balanced by a concern that the agreement was arrived at fairly and equitably.

Because of the import which is given to a person's assent to any agreement, "to overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required" (*Backer Mgt. Corp. v Acme Quilting Co., supra,* p 219). The right to rescission or reformation must be proved by clear and convincing evidence (*Backer Mgt. Corp. v Acme Quilting Co., supra,* pp 219-220; *Goodison v Goodison,* 66 AD2d 923, 924-925, affd 48 NY2d 786). A request for such equitable relief must be contained in the pleadings as a cause of action or by way of an affirmative defense, set forth in detail and with particularity (*Christian v Christian,* 42 NY2d 63, 72, *supra; Isaacs v Schmuck,* 245 NY 77; *Susquehanna S. S. Co. v Andersen & Co.,* 239 NY 285, 292-294; *Shapiro v Shapiro,* 84 AD2d 534; *Turnpike Serv. Sta. v Blue Bird Petroleum Corp.,* 18 AD2d 723). Furthermore, by his own acts or words a party may ratify what would otherwise be a questionable contract or provision of a contract (*Beutel v Beutel,* 55 NY2d 957; *Matter of Rothko,* 43 NY2d 305, 323-324; *Freimour v Freimour,* 78 AD2d 896).

With the above general discussion in mind, we return to the case at bar. The possibility of a mutual mistake need not concern us; there is no indication in the record that the agreement does not comport with plaintiff's intent (see *Ross v Food Specialties,* 6 NY2d 336, 341). Our distinguished colleagues in the dissent maintain that defendant is entitled to reformation because of defendant's mistake. However, this case is not really a reformation case at all. Reformation is designed to bring a written contract into conformity with the actual agreement of the parties, where the writing is inaccurate because of mutual mistake or fraudulently induced, unilateral mistake. It cannot be utilized to vacate a portion of an agreement which, in fact, does comport with the parties' intention (see *Corcoran v*

*Corcoran,* 73 AD2d 1037, 1038). By striking the NINTH paragraph, in the face of the affirmative finding that the parties did contemplate the payment of alimony to the wife, it is clear that the trial court did not reform the agreement to coincide with the parties' true intentions. Rather, in effect, the court prospectively rescinded a portion of the agreement (cf. *Da Silva v Musso,* 53 NY2d 543, *supra*). It apparently concluded that the NINTH paragraph was severable from the rest of the agreement but that the support and alimony provisions set forth in that paragraph were not severable from each other. The question to be answered, then, is whether this partial rescission was proper.

Defendant's answer contains no counterclaims and cannot be interpreted as setting forth an affirmative defense of partial rescission, as maintained by the trial court. The only language found in the answer which is remotely pertinent is found in his "SECOND SEPARATE AND DISTINCT DEFENSE", which reads as follows:

"That in order to induce defendant husband acting without benefit of legal counsel to enter into the contract set forth in plaintiff's complaint herein, plaintiff stated and represented to defendant former husband that payments made by defendant husband to the wife out of which it is understood she will support their minor children, (now emancipated) would relieve defendant husband of duty, to support minor children after separation rather than a separate clause in the agreement spelling out payment of a specific sum as support for the minor children.

"That such statements were false and were known to the plaintiff to be false at the time they were made. That in truth and in fact there are important differences between payments made by defendant former husband to the plaintiff wife out of which it is understood, however, without benefit of clear language she will support her minor children, (now emancipated) and those payments which the terms of an agreement fix as a sum which is payable for the support of minor children with benefit of clear language.

"That defendant husband did not know the truth with regard to such statements and representations but believed them to be true and relied thereon and in such

reliance entered into the agreement set forth in plaintiff's complaint; that defendant would not have entered into the said agreement had he known the truth with regard to such representations."

Nowhere does defendant state, in the above-quoted paragraphs, that he was misled into thinking that his payment obligations would terminate on the children's emancipation or on their reaching the age of majority. The defense, to the extent that it is intelligible, seems to be saying that defendant was told that payments made pursuant to the agreement would exhaust his obligations of child support, i.e., that he had no obligation to support his children beyond the payments to his wife required by the contract. Plaintiff does not now claim differently.

The general rule is that an affirmative defense is deemed waived if not raised in the pleadings (CPLR 3018, subd [b]; *De Lisa v Amica Mut. Ins. Co.,* 59 AD2d 380, 382). Such a waiver can be retracted by amendment of the answer (CPLR 3025; see *Pace v Perk,* 81 AD2d 444, 462). Neither during nor after trial did defendant request leave to amend his answer to assert a counterclaim or affirmative defense of rescission predicated, at least in part, on a mistaken notion that he thought his payment obligation would cease on the children's emancipation or majority. Were he to have made a motion to amend his answer, it would very likely have been denied, since the courts are reluctant to allow an amendment based on facts which were known prior to commencement of the action (*Pace v Perk, supra,* p 463). Furthermore, permission to amend an answer should not be granted if the plaintiff would be thereby prejudiced (*Pace v Perk, supra,* p 463). In this case, we cannot say that a belated claim for rescission, based on an alleged mistake induced by improper conduct, was not prejudicial to plaintiff. It may well have been that, if the defense now argued had been properly raised, plaintiff's trial tactics would have been different (see *Farrington v Farrington,* 272 App Div 818). Moreover, by effectively rescinding a portion of the agreement without amending the answer to provide a counterclaim for rescission, the court prevented plaintiff from interposing, if she desired, a reply containing a Statute of Limitations defense (CPLR 213, subds 1, 6, 8; *Greene*

*v Greene,* 56 NY2d 86, 93; *Abbate v Abbate,* 82 AD2d 368, 386-387; cf. *Pace v Perk, supra,* p 463).

More important than the failure to plead is the fact that the evidence presented did not justify a partial rescission. Assuming, *arguendo,* that defendant has clearly shown that he signed the agreement with a mistaken notion of what it entailed, unilateral mistake alone is an insufficient basis for reformation or rescission (*Winant v Winant,* 83 AD2d 849, affd 55 NY2d 870). " 'Mistake, to be available in equity, must not have arisen from negligence, where the means of knowledge were easily accessible' " (*Da Silva v Musso,* 53 NY2d 543, 551, *supra,* quoting *Grymes v Sanders,* 93 US 55, 61). "Even one who fails to read documents prepared by another, *in the absence of fraud or other wrongful act by the other contracting party,* is conclusively presumed to know its contents and to assent to them, if he signs them" (*Johns-Manville Sales Corp. v Stone,* 5 AD2d 110, 114; emphasis supplied).

The trial transcript is bereft of any allegation, much less evidence constituting clear and convincing proof, that plaintiff made misrepresentations, fraudulent or otherwise, causing defendant to believe that his obligation would cease on the children's emancipation or majority, thereby inducing him to sign the agreement (see *Seyfried v Greenspan,* 92 AD2d 563). Nor do we find that defendant's signature was the product of duress or undue influence. There remains only the test set forth in *Christian v Christian* (42 NY2d 63, *supra*), that is, is the separation agreement manifestly unfair and, if so, was that unfairness a result of plaintiff's overreaching? (See *Martin v Martin,* 74 AD2d 419, 423.)

In our view the provision for unallocated payments to the wife is not manifestly unfair. There are various reasons that parties to a separation agreement would wish that a payment provision not allocate between alimony and child support. The most notable, perhaps, and one which defendant certainly could not quarrel with, is that the spouse who makes the payments can claim the total amount as alimony for tax purposes (see *Richards v Richards,* 86 AD2d 771). Furthermore, continuing such payments past the time the children become emancipated or reach adult-

hood is also not necessarily unfair. Where, for example, as in this case, a unitary payment is being made to cover various expenses such as the costs incident to ownership of the marital home which is owned by the parties as tenants by the entirety, it is not unreasonable to expect the payments to continue unabated past the time the children have left home. In such a situation, both parties are reaping, or at least will reap, the benefit. Furthermore, and most important, is the aspect emphasized by the plaintiff. The separation agreement contains no cost-of-living clause. In a time of high inflation, parties to a separation agreement might well consider it fair to assent to a set monthly payment and to exclude a cost-of-living clause, where certain of the expenses to be met through the payment, such as child support, were expected over time to either diminish or disappear altogether. As defendant himself stated, prior to entering into the agreement, things would "even out as the years go by".

We also find no overreaching present in the execution of the separation agreement. The only allegation of such found in the record is defendant's testimony on direct that when he was in the office of plaintiff's attorney, just before signing the agreement, plaintiff's attorney discouraged him from getting a lawyer by telling him that a lawyer would be expensive and that he didn't need one, since the agreement contained everything that the parties had previously discussed. It is well settled that the mere fact that a party to a separation agreement was unrepresented does not, without more, establish overreaching (*Goodison v Goodison,* 48 NY2d 786, *supra;* cf. *Levine v Levine,* 56 NY2d 42, *supra*). Apparently, the testimony concerning the comments allegedly made by plaintiff's counsel was intended to provide the additional evidence necessary to show overreaching. However, we are unpersuaded. Defendant, a police officer most of his life and a detective since 1965, is hardly the sort of person one would expect to be vulnerable to coaxing contrary to his desire. As defendant himself indicated to plaintiff's lawyer, attorney fees were not the issue since he had several lawyer friends who could explain the agreement to him. In fact, eventually, he did show the agreement to several lawyers. Plaintiff's lawyer

made it very clear to defendant that he was representing his wife. As the trial court found, he advised defendant of his right to his own attorney. These facts demonstrate a scrupulous respect for defendant's rights. It is noteworthy that the last paragraph of the agreement, the TWELFTH paragraph, is located just above defendant's signature and reads as follows: "Each of the parties hereto has had the opportunity offered to them [*sic*] to obtain separate legal counsel, and each has read this agreement and understands the contents of same and each has signed same voluntarily as they agree that the terms of said agreement are fair, reasonable and equitable." Defendant deliberately exercised a choice not to have legal representation.

The comment by plaintiff's lawyer, assuming it was made, that the agreement contained everything that the parties had discussed has not been contradicted by defendant. While, perhaps, the agreement contained matters neither discussed nor intended by defendant, a conclusion with which we by no means are in agreement, defendant cannot lay the blame for any misconception on plaintiff or her counsel. In *Goodison v Goodison* (48 NY2d 786, *supra*), the defendant claimed, among other things, that he was unrepresented when he entered into a separation agreement and that his wife's attorney misled him by stating incorrectly that the amount of support could be modified by the Family Court. Despite this statement, which was far more egregious than anything present in this record, the Court of Appeals held that there was "no basis for relief under *Christian v Christian* (42 NY2d 63)" (*Goodison v Goodison, supra,* p 788).

Not only do we find that defendant's assent to the separation agreement was not induced by any wrongful conduct on the part of plaintiff or her attorney, but we are also of the view that a finding of mistake on defendant's part, however caused, is unwarranted. Contrary to defendant's remonstrations at trial, it is apparent that he intended to provide maintenance for his wife. Not only is this expressed in the agreement, but the surrounding circumstances and defendant's conduct demonstrate that this is so. At the time the agreement was signed, the two children were 12 and 13. Defendant was working two jobs. Plaintiff

planned on obtaining part-time employment to help with the situation, but defendant was primarily the bread winner, while plaintiff cared for the children and the home. In these circumstances, which are so common in today's world, it would be quite unusual for payments provided for in a separation agreement not to include some maintenance for the wife. As for defendant's conduct, starting in 1973, the year the agreement was signed, defendant claimed a tax deduction for the $600 monthly payment as alimony. While he was entitled to the deduction because alimony and child support were unallocated (*Richards v Richards,* 86 AD2d 771, *supra*), the fact that he took the deduction shows that he understood that the agreement included alimony. It is also noteworthy that, even after July of 1978, when, instead of making the monthly payments to his wife, defendant placed the money in a bank account, he claimed for tax purposes that this money was alimony. The fact that he took no action to upset the agreement also belies any claim that the agreement was not meant to provide an unallocated payment of alimony and support.

The most that can be said in defendant's favor is that while he intended to pay alimony and child support, he only expected to have to pay support under the contract while the children remained children. It does not appear to us that defendant proved by clear and convincing evidence that he had such a mistaken belief. After all, he agreed to unallocated payments, and, despite being aware of the agreement's language and having had numerous friends who were attorneys read the document, he made no effort to reform or rescind the agreement.

Defendant's conduct over the years is significant, not only because it is indicative of whether in entering into the agreement he was operating under a misconception, but also because it demonstrates the existence of ratification. "The power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake or of the misrepresentation if it is non-fraudulent or knows of the misrepresentation if it is fraudulent, he manifests to the other party his intention to affirm it or *acts with respect to anything that he has*

*received in a manner inconsistent with disaffirmance"* (Restatement, Contracts 2d, § 380, subd [2]; emphasis supplied; see *Beutel v Beutel,* 55 NY2d 957, *supra; Matter of Rothko,* 43 NY2d 305, 323-324, *supra; Schenck v State Line Tel. Co.,* 238 NY 308, 313; *Sheindlin v Sheindlin,* 88 AD2d 930; *Freimour v Freimour,* 78 AD2d 896, *supra*). Admittedly, knowing, as of the summer of 1973, what the agreement obligated him to do, defendant's utilization of the $600 monthly payment as a tax deduction, even after he stopped paying the same to plaintiff, and his failure to ever bring an action for reformation or rescission establish ratification. Such was the finding of the trial court when it determined that defendant could not be relieved on equitable grounds from the obligation to make payments up to the time of trial. It was inconsistent and improper for the trial court to then prospectively annul the payment provision of the agreement.

We therefore conclude that the NINTH paragraph of the agreement between the parties should not be annulled. Not only did defendant fail to properly raise in his answer, by affirmative defense or counterclaim, the contention that this paragraph should be rescinded, but, more importantly, he failed to show that his assent to the terms of the agreement, which are not manifestly unfair, was the result of mistake or induced by fraud, duress, or overreaching. Moreover, by reaping benefits over the years from the provision in question and by not bringing an action for rescission or reformation, defendant ratified the agreement. Since the NINTH paragraph should not have been rescinded, we have no occasion to consider whether the separation agreement is severable (see *Matter of Wilson,* 50 NY2d 59, 65; *Christian v Christian,* 42 NY2d 63, 73, *supra*).

Accordingly, the judgment should be reversed insofar as appealed from by deleting the third decretal paragraph insofar as it purports to annul the NINTH paragraph of the separation agreement.

O'CONNOR, J. (dissenting). The record shows in this case that in response to the plaintiff wife's action for a money judgment on the parties' May 22, 1973 separation agreement the defendant husband's answer awkwardly alleged,

*inter alia,* that through his mistake and her fraud the language of the written instrument failed to express their intention that his obligation to support their children would terminate on their emancipation.

Although the technical term "reformation" was not used during the course of litigation until this appeal, both parties deliberately and extensively elicited parol evidence during the course of trial relevant to such relief.

It was not disputed that the parties alone, without benefit of counsel, sat down one day at their kitchen table and agreed that defendant would pay plaintiff $600 monthly to maintain the marital residence and support the children there. There was no conflict as to defendant's moving out of the home, or as to such issues as custody, visitation or insurance coverage. The defendant denied negotiating the issue of a cost-of-living adjustment or contingencies affecting the monthly amount; plaintiff testified that defendant had refused the cost-of-living increase and payments for the children's college education on the ground that the costs would "all even out as the years go by". Having in mind the experience of their neighbor, whose husband had taken their children and moved into a new house, plaintiff said she and her husband specifically intended to provide enough support to maintain the marital residence for the benefit of their two children, who, at their age, needed the stability of their neighborhood friends and the familiarity of the home.

Plaintiff agreed with defendant's testimony that they had never discussed under what circumstances, such as remarriage, the payments would cease. On redirect, however, she said she had "believe[d]" that he had been aware of the unconditional, perpetual nature of his obligation; she said this was an inference she drew from his refusal to agree to a cost-of-living adjustment despite the fact that he would have a good pension after 20 years' service in the local police department while she was just starting out as a real estate sales agent.

After their kitchen table talk, an attorney representing plaintiff drew up the instrument executed May 22, 1973, which provides in paragraph NINTH that "[t]he husband agrees to pay to the wife for the support and alimoney [*sic*]

the sum of Six Hundred ($600.00) Dollars per month, recognizing that his income presently prevent [*sic*] him from paying more." Defendant testified that he did not bother conferring with an attorney about the language of the instrument until plaintiff, during an argument subsequent to execution, warned him that he had bound himself to an unlimited obligation to pay her $600 monthly. After consultation with counsel, defendant understood that the language of the instrument was unconditional but he never intended to continue payments past the point at which both children were emancipated. He did not, however, stop or modify the payments even when plaintiff took in an adult male boarder in 1975 nor when the younger child moved in with him and subsequently entered military service. He stopped his payments to plaintiff and instead paid them into a bank account with himself as trustee for the benefit of the children as of July, 1978 because the older child was leaving home to attend college out of State and has since married. He nevertheless continued to deduct the full amount of such payments through the end of 1980 on his tax returns.

Trial Term found that the parties had agreed on the sum of $600 monthly as support for the children and upkeep of the marital residence, which at the time of trial in January, 1981 was owned by the parties as tenants by the entirety. It further found that at no point did either specifically address the issue of what portion, if any, of the installments was to be allocated to alimony when the children became emancipated or if the plaintiff remarried.

Since defendant had made payments under the agreement to his wife and on his own initiative to a bank account later while taking full advantage of the income tax deduction for alimony through 1980, the court awarded judgment to plaintiff for all amounts due under the language of the support provision up to the date of trial. Since the answer had sufficiently raised the issue of mistake, however, the court additionally ruled that it would strike from the separation agreement the entire support provision. The court reasoned that its language contemplated support of plaintiff and the children without allocation, and the court itself could not redraft it to reflect any

particular allocation because the parties themselves had not addressed that issue in reaching their agreement in 1973. The court nevertheless left intact a provision giving plaintiff exclusive possession of the marital home, on the ground that no ambiguity appeared in the language making such provision.

It is clear on this record that Trial Term correctly struck the support provision in the exercise of its equitable power to reform the written instrument imperfectly expressing the parties' limited agreement concerning alimony and child support.

It is well settled that the object of reformation is to conform the written instrument to the actual agreement of the parties (see *Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 219). Reformation is available only if the actual agreement is shown to be at variance with the terms as written through the mistake of a scrivener or of either party, no matter how it occurred (see *Harris v Uhlendorf,* 24 NY2d 463, 467; *Nash v Kornblum,* 12 NY2d 42; *Hart v Blabey,* 287 NY 257; *Born v Schrenkeisen,* 110 NY 55, 59; *Meier v Brooks,* 22 AD2d 56, 59). The mistake cured by reformation is not a mistake of fact or law under which the parties labored in entering the agreement. Instead, it is the error they (or their scrivener) made in failing to reduce the substance of their agreement to a writing drafted in such a way as to describe no more, and no less, than the limited issues as specifically resolved by their agreement (see *Harris v Uhlendorf, supra,* p 467; *Nash v Kornblum, supra,* p 47; *Salomon v North Br. & Mercantile Ins. Co.,* 215 NY 214, 219; *Christopher & Tenth St. R. R. Co. v Twenty-Third St. Ry. Co.,* 149 NY 51, 56, 58; *Allison Bros. Co. v Allison,* 144 NY 21, 30; *Nevius v Dunlap,* 33 NY 676, 680-681; *Rider v Powell,* 28 NY 310; *Eastern Air Lines v Trans Caribbean Airways,* 29 AD2d 379, 383, affd 23 NY2d 709; *Stolitzky v Linscheid,* 150 App Div 253).

A party relying on the instrument cannot defeat a claim for reformation on the ground of the other party's failure to read or understand the instrument (see *Hart v Blabey, supra,* p 262; *Albany City Sav. Inst. v Burdick,* 87 NY 40; *Meier v Brooks, supra,* p 60; *Raby v Greater N. Y. Dev. Co.,* 151 App Div 72, affd 210 NY 586; *Jamaica Sav. Bank v*

*Taylor,* 72 App Div 567, 573-574). Nor is the failure to plea reformation a bar to such relief (see *Susquehanna S. S. Co. v Andersen & Co.,* 239 NY 285; *Born v Schrenkeisen, supra,* p 60; *Pitcher v Hennessey,* 48 NY 415, 423; *Hotel Credit Card Corp. v American Express Co.,* 13 AD2d 189, 194; *Carvalho v Sudderly,* 169 App Div 652, 655; *Arlt v Whitlock,* 65 App Div 246). Proof of the variance between the meeting of the minds and its expression in the writing must be clear (See *Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 219-220, *supra*). " ' "If the environment and the motive of the parties, the consideration and the necessities to be met, make the contract as it is written a highly improbable one, one for which there was no motive, or necessity, or consideration, then the writing has little self-supporting force, and a relatively small amount of clear and credible evidence will establish the mistake" ' " (*Meier v Brooks, supra,* p 60).

With the exception of plaintiff's unpersuasive comment, contradicting her other testimony, that she "believed" that defendant had known his agreement was to be a perpetual and unconditional obligation, the testimony of the parties supports Trial Term's findings to the effect that the parties never addressed and therefore never resolved the issue of how (and whether) defendant's monthly payments were to be reduced or eliminated upon the children's emancipation. The evidence shows their attention had been focused solely on the issue of keeping the marital roof over the heads of those children. It was, of course, inconsistent for Trial Term to reform the parties' writing to eliminate the support provision at the same time it awarded plaintiff a money judgment under the same provision and preserved the provision granting plaintiff exclusive occupancy of the marital home. Since defendant failed to cross-appeal from the judgment, however, this court cannot cure the error. Furthermore, the parties' failure to agree on the nature or extent of defendant's statutory obligation of spousal support does not relieve defendant of that obligation.

Nevertheless, the record fully supports the trial court's reformation of the instrument memorializing the parties' separation agreement respecting alimony and child support — or, more accurately, maintenance of the marital

residence and child support. As a matter of contract analysis under this equitable doctrine, the only question before the court was whether there had been a meeting of the parties' minds upon the issue of the *duration* of the defendant's *separate* alimony and child support obligations in light of the fact that, as found by the court after a hearing (see *Wack v Wack,* 74 NYS2d 435), the obviously significant issues of the children's inevitable emancipation or the plaintiff's remarriage had never arisen during the parties' negotiations. That question, on this record, could only have been answered in the negative.

The statutory obligation of child support terminates upon emancipation (see Domestic Relations Law, § 32, subd 3; Family Ct Act, § 413; Social Services Law, § 101, subd 1). Thus the natural and logical inference to be drawn from the incorporation of this statutory obligation in a separation agreement is that the contractual obligation thus created *is* limited in duration to the children's minority. An express provision terminating the undertaking upon emancipation would be superfluous.

It is of course true that the parties' failure to allocate stated portions of defendant's undertaking between child support and alimony would permit the drawing of an inference that emancipation was *not* intended to work a reduction in the amount of the undertaking because the entire undertaking would be subsumed under the head of alimony at that point. But it must be emphasized that these contradictory inferences remain inferences of *fact*.

There is simply no authority for the proposition that an unallocated, unitary provision for alimony and child support — in the absence of *any* term of limitation or condition — raises an irrebuttable legal presumption that the parties intended no modification of the undertaking upon the children's emancipation. The parties' failure to express the consequences of emancipation in their agreement certainly does not mandate a finding that their omission was intentional and that, accordingly, the undertaking was meant to be unaffected by emancipation.

Furthermore, since the court here had expressly found as a fact that during their negotiations, the parties had never even addressed the consequences flowing from emancipa-

tion, there is no basis for arguing that the court should nevertheless have ruled as a matter of law that the parties' failure to allocate alimony separately from child support *required* it to declare that the entire undivided contractual obligation must continue in full force and effect so long as defendant was statutorily liable for *either* alimony or child support.

In the first place, the decisions that have refused a reduction in an unallocated provision for alimony and child support upon emancipation merely construed separation agreements that, unlike the agreement proved here, contained express terms dealing with future contingencies such as emancipation or remarriage. Applying the standard rule for the construction of integrated written contracts, the courts merely concluded that the express inclusion of some contingency terms logically excluded their finding of any additional unexpressed terms. (See *Nichols v Nichols,* 306 NY 490; *Rehill v Rehill,* 306 NY 126; *Stern v Stern,* 41 AD2d 676, mot for lv to app dsmd 32 NY2d 704; *Craig v Craig,* 24 AD2d 588; *Harwood v Harwood,* 182 Misc 130, affd 268 App Div 974.) This analysis, however, would be relevant here only if defendant had challenged the meaning of the parties' agreement rather than the fidelity of the poorly drafted written instrument to their actual agreement. This crucial distinction between interpretation and reformation was recognized by the Court of Appeals in both *Nichols v Nichols (supra)* and *Rehill v Rehill (supra).*

In the second place, the support provisions of a separation agreement are not an all-or-nothing proposition. The duration of the agreement to make periodic alimony payments need not be coextensive with the statutory obligation of support in order to escape invalidation by former section 5-311 of the General Obligations Law, which limited attempts to relieve spouses of their statutory support obligations (see *Kromberg v Kromberg,* 44 NY2d 718, 720; *Seligman v Seligman,* 78 Misc 2d 632, 634-635). Therefore, the trial court was not required to rule in the case at bar that as a matter of law, regardless of the parties' agreement or lack thereof, defendant's contractual undertaking to pay an unallocated periodic sum in satisfaction of his statutory alimony and child support obligations continued in full force and effect until *both* statutory obligations ceased by operation of law.

In sum, the evidence in the record adequately supported the trial court's finding that the duration of the parties' actual agreement on the subject of periodic alimony and child support payments was limited to the children's minority. Because the parties had not considered their postemancipation obligations, they could not be said to have made any decision on either modifying or continuing the unitary payment provision. In other words, since they had not even adverted to the inevitable event of emancipation during their negotiations, their minds could hardly have met on a resolution of the consequences that ordinarily . flow from that event. Nor is there any salutary purpose in discouraging such short-sighted agreements by indulging in a fiction that any such short-term agreement will be construed as governing the long term, regardless of the parties' intentions or lack thereof.

Upon emancipation of the parties' children, therefore, defendant's contractual undertaking to pay periodic sums in satisfaction of his alimony and child support obligations terminated for lack of any agreement addressing his postemancipation statutory liability. The trial court thus properly ruled that the entire provision for alimony and child support in the instrument sought to be reformed was no longer effective.

Accordingly, the judgment must be affirmed insofar as appealed from.

TITONE, J. P., and GULOTTA, J., concur with GIBBONS, J.; O'CONNOR and BOYERS, JJ., dissent and vote to affirm the judgment insofar as appealed from in an opinion by O'CONNOR, J.

Judgment of the Supreme Court, Westchester County, dated April 22, 1981, reversed insofar as appealed from, on the law and the facts, with costs, and the third decretal paragraph is deleted insofar as it purports to annul the NINTH paragraph of the parties' separation agreement.