Filed 4/12/21  Simon v. Wells Fargo Bank etc. CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| FREDERICK J. SIMON, as Trustee, etc., | C086688 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20140035) |
| v. | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | |
| Defendant and Respondent. | |

This case arises out of a set of complex commercial real estate loans totaling $4.6 million that were made by Wells Fargo, National Association (Wells Fargo), to Frederick J. Simon, as trustee of the Frederick J. Simon Revocable Trust (Simon), to provide partial funding for the purchase of a shopping center in Placerville, California.  The initial two commercial agreements were made in January 2007 and shared a 6.4 percent fixed interest rate.  In March 2007, Wells Fargo offered Simon a better interest rate if the parties entered into "swap transactions" that had the net effect of converting Simon's

1

interest obligations into a rate of 1.03 percent above LIBOR.[1]  Because LIBOR was 5.25 percent at the time, the cumulative product of the loan agreements was a 6.28 percent fixed interest rate.  Simon accepted the new, lower rate and executed three more agreements with Wells Fargo that supplemented the original loan agreements.  Simon made the required payments until the loans' June 2012 maturity date, when he defaulted on the remaining obligation.  Wells Fargo foreclosed on the shopping center, and Simon sued for breach of contract, wrongful foreclosure, and concealment.  The trial court entered judgment in favor of Wells Fargo after it prevailed on demurrer and summary judgment.

On appeal, Simon contends (1) Wells Fargo breached the loan agreement terms "by charging interest in excess of the LIBOR benchmark rate, plus 1.03%," (2) Wells Fargo did not comply with its duty to disclose how the swap transactions would affect the debt obligations, (3) the interest rate swaps should be voided due to unilateral mistake, (4) the interest rate swap agreements are voidable for lack of consideration, (5) Simon's operative complaint "support[s] the theory of breach of the implied covenant" of good faith and fair dealing, (6) his cause of action for wrongful foreclosure should be excused from the tender rule, and (7) the trial court should have denied attorney fees because the fee-shifting provisions in the various loan documents did not provide for fees as claimed by Wells Fargo.

We conclude that to the extent an argument is premised on Wells Fargo engaging in a breach of contract by charging excess interest, the argument is insufficiently developed for review on the merits.  As to breach of the duty to disclose and unilateral mistake, we reject Simon's argument under the governing law of the loan agreements, which is New York State law.  Simon's argument regarding lack of consideration is

---

[1]     LIBOR refers to the London Interbank Offered Rate.  (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 96.)

2

forfeited for lack of relevant legal authority in support. The cause of action for breach of the covenant of good faith and fair dealing was not pleaded and therefore cannot serve as a ground for reversal of the judgment of dismissal. The trial court properly determined that the tender rule bars Simon's claim of wrongful foreclosure. Finally, we conclude that the loan documents provided for fee-shifting that supported the trial court's award of attorney fees to Wells Fargo. Accordingly, we affirm the judgment and the postjudgment order granting attorney fees to Wells Fargo.

## FACTUAL AND PROCEDURAL HISTORY

### *Demurrer*

In reviewing the trial court's order sustaining Wells Fargo's demurrer without leave to amend, we accept as true the factual allegations properly pleaded by Simon. (*Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200; *Construction Protective Services, Inc. v. TIG Specialty Ins*. Co. (2002) 29 Cal.4th 189, 193.) Accordingly, our statement of facts derives from the material allegations set forth in the Simon's second amended complaint (the operative complaint). (*Gu v. BMW of North America, LLC,* at p. 200; *Construction Protective Services, Inc. v. TIG Specialty Ins*. Co., at p. 193.)

Simon's operative complaint asserts claims against Wells Fargo for breach of contract, wrongful foreclosure, and concealment. In support of his claims, he alleged that at all times relevant to the allegations in his operative complaint he was acting as trustee of the Frederick J. Simon Revocable Trust. In 2007, Simon was contemplating a purchase of a shopping center for $7.8 million. He intended to use $3.2 million of his own money and secure a loan for $4.6 million to fund the remainder of the purchase price.

Simon approached Wells Fargo to inquire about a commercial real property loan. Simon had previously received seven commercial loans from Wells Fargo, each with a

3

fixed interest rate.  Simon discussed loan options with Wells Fargo commercial loan officer, Michael Frost.  Frost proposed two loans – one for each of the two parcels comprising the shopping center.  The loans would total $4.6 million with monthly interest at 6.5 percent for a five-year period with a balloon payment at the end of the term.  Simon rejected a 6.5 percent interest rate loan before accepting a 6.4 percent interest rate.[2]

A few days after Simon submitted the signed loan applications, Frost stated that "he could obtain better interest rates and terms on the loans if the parties included Interest Rate Swap Transactions as part of the loans."  Simon asserts he "had no idea what or how an Interest Rate Swap Transaction worked or how it would affect any loan terms or the interest rates thereon . . . ."  Frost explained that Simon "would get a fixed interest rate of 5.25% and then 'swap' that rate with an adjustable interest rate that was tied to LIBOR. [¶] . . . [W]ith Wells Fargo's fixed charge over the LIBOR rate, the adjustable interest rate for the first month of the loans would be less than the 6.3% fixed rate loans for which [Simon] had previously submitted his applications."  Frost represented that the LIBOR rate was falling, the economy was slowing, and that a falling rate would cause the proposed adjustable rate to fall too.  However, if LIBOR rose then Simon's rate would rise too.  The adjustable rate would be capped to a 2 percent maximum increase.  To convert Simon's debt obligations to variable rate, Wells Fargo presented him with an "ISDA Confirmation for the Interest Rate Swap Transaction"[3] for each of Simon's two loans.

---

[2]    In his declaration in support of his opposition to summary judgment, Simon stated that the interest rate on the initial loans was a fixed 6.4 percent.  Simon also introduced a letter to him from Wells Fargo that showed the interest on the initial loans to be 6.4 percent.

[3]    "ISDA" refers to the International Swaps and Derivatives Association, Inc.  We refer to the agreements containing the variable interest rate provisions for Simon's debt obligations as "the ISDA confirmation letters."

On March 12, 2007, Simon signed loan documents for a $2.1 million loan secured by a note (Note A) on the first parcel (Parcel 1) of the shopping center. Wells Fargo instructed Simon to cross out provisions in Note A allowing the borrower to convert the loan to a fixed rate. Simon complied. That same day, Simon also signed loan documents for a $2.5 million loan secured by a note (Note B) on the second parcel (Parcel 2) of the shopping center. As with the other note, Simon crossed out the provision in Note B that allowed the borrower to convert the loan to a fixed rate. Simon signed Notes A and B. Notes A and B contain adjustable rate clauses setting the interest rate at 1.03 percent above LIBOR on the first day of each fixed rate term. The rate recalibrated on a monthly basis.

On March 16, 2007, Wells Fargo funded the loans secured by Notes A and B. About a week later, Wells Fargo presented Simon with two separate ISDA confirmation documents: ISDA confirmation 1 applied to Note A, and ISDA confirmation 2 applied to Note B. The ISDA confirmations refer to the interest rate swap transactions but "stated that [Simon's] interest rates for each loan issued under Note A and Note B was fixed at 5.25% . . . ." The operative complaint alleges that "only Wells Fargo knows what interest rates it was to charge [Simon] because the contract documents referenced herein do not explain what interest rates [Simon] should have paid."

Simon used the loan proceeds to purchase the shopping center. Beginning in April 2007, Wells Fargo billed Simon on a monthly basis over the course of the next five years for the loans. In February 2010, Simon "realized . . . that the shopping center would soon generate insufficient income to meet the shopping center's operating expenses and [his] debt service obligations that [*sic*] had been wrongfully inflated by Wells Fargo." Wells Fargo requested various financial statements, which Simon promptly supplied. On further request, Simon also submitted documents related to another shopping center that provided income used by Simon to service the debt related to the Golden Center Plaza shopping center. After several months of delays, Simon met with Wells Fargo Vice

5

President Mark Hoffman who told him that Wells Fargo " 'owed [him] some money.' " (Original brackets.) Hoffman, however, did not explain why Wells Fargo owed money to Simon. Simon's "only conclusion as to why Wells Fargo admittedly owed [him] money was because of problems with the loans . . . ."

Simon remained current on payments until March 15, 2012. Simon obtained extensions on the maturity dates for Notes A and B until June 15, 2012. He ceased making payments after June 15, 2012. On August 17, 2012, Wells Fargo gave notice of default and stated that Simon owed a total of $4,157,350.60 in principal and interest on Notes A and B. Simon's operative complaint alleges that he actually owed $817,797.60 less than what Wells Fargo demanded in principal and interest.

Wells Fargo scheduled the property for nonjudicial foreclosure for January 7, 2013. After receiving no acceptable offers, Wells Fargo took ownership of Parcels 1 and 2. About a month later, Wells Fargo sent a form to the Internal Revenue Service that valued the properties at a total of $3,780,000. Simon's operative complaint alleges that, "to this day, [Simon] still does not know the actual, total amount of the overpayments to Wells Fargo as he cannot ascertain from the loan documents the proper interest rates for both loans."

Wells Fargo demurred and filed a motion to strike the punitive damages allegations from the complaint. Simon opposed the demurrer and motion to strike. The trial court sustained the demurrer without leave to amend as to the causes of action for wrongful foreclosure and concealment. The trial court rejected Simon's contention that he was excused from tendering the amount due on the loans before maintaining a claim for wrongful foreclosure. Although Simon asserted that he was attacking the validity of the debt, the trial court found that Simon's pleadings admitted he owed more than $3 million on the fully matured loans. The trial court further found that it was equitable to require Simon's tender because of his admission that he owed repayment of the loans. As to concealment, the trial court found that "[t]he alleged partial representation allegedly

6

concealing exactly why money was owed to [Simon] is not a concealment of material fact that was unknown to [Simon]." Because the remaining cause of action for breach of contract did not support a claim of punitive damages, the trial court struck the punitive damages claim without leave to amend.

### *Summary Judgment*

In September 2017, Wells Fargo moved for summary judgment on the remaining cause of action for breach of contract. Wells Fargo argued that it did not breach the loan agreements by overcharging interest to Simon. In addition, Wells Fargo asserted that the statute of limitations had run on the claim.

Simon opposed summary judgment on grounds that the trial court had equitable power to void the ISDA confirmation letters due to Wells Fargo's failure to make adequate disclosures. Simon also argued that the continuing accrual of his cause of action with every wrongful billing by Wells Fargo meant that his action was timely.

Wells Fargo filed a reply in which it argued that Simon had not pleaded a lack of legally required disclosures in his operative complaint. Wells Fargo asserted that it had provided all the information necessary to inform Simon that he was receiving 6.28 percent loan. The reply also asserted that Simon had not properly pleaded claims of unilateral mistake and lack of consideration.

The trial court granted summary judgment. In granting summary judgment, the trial court construed all of the loan agreements as a single contract between the parties. The trial court explained the ISDA letter confirmations – together with the ISDA master agreement – essentially effected a "variable rate interest tied to LIBOR, while the swap transactions as described by [Wells Fargo's] most knowledgeable person during his deposition testimony are partially fixed and partially adjustable rate agreements that result in an effectively fixed rate of 6.28% by means of two variable rate agreements in each loan wherein [Simon] agrees to pay a variable rate based on the LIBOR rate plus

7

1.03%, Wells Fargo agrees to pay the variable LIBOR rate on the loan resulting in a 'wash' on the LIBOR rate, and [Simon] agrees to pay 5.25% as a fixed rate, plus the 1.03% he originally agreed to pay."

In rejecting Simon's claim of inadequate disclosure, the trial court found that Simon "admits receiving the ISDA Confirmation agreements 9-10 days after executing the business confirmation letters; he executed those ISDA Confirmation agreements; and at the time of execution he was presented with the ISDA Master Agreement." As to the claim of unilateral mistake, the trial court explained that it was "unable to find any allegations within the 2nd amended complaint that [Simon] executed all the documents related to the subject transaction while acting under a unilateral mistake as to what . . . interest rate [he] agreed to due to a purported misrepresentation by Wells Fargo Bank concerning how the swap transaction affected the interest rates included in the notes, or that defendant failed to make legally required disclosures related to swap transactions." The trial court determined that adequate consideration supported the additional loan agreements reflected in the ISDA confirmation letters.

The trial court rejected Simon's argument regarding excess interest by finding that the "evidence establishes that [Simon] and [Wells Fargo] entered into two loan agreements wherein [Wells Fargo] agreed to loan [Simon] $4.6 Million in exchange for repayment of the loans in full within five years at an effectively fixed interest rate of 6.28%. [Wells Fargo's] Vice President declares that he personally calculated the interest rates applied to the two subject loans and confirmed that the interest rates charged to [Simon] on those two loans never exceeded 6.28% on the life of the loans. [Citation.] [¶] The evidence submitted in support of the motion meets [Wells Fargo's] initial burden to show that one of the elements of the breach of contract cause of action cannot be established, because the evidence establishes that defendant Wells Fargo Bank did not breach the loan agreements by charging interest rates in excess of the amount allowed under the two modified loans during the term of the loans. [¶] [Simon] failed to submit

8

any evidence in opposition to the motion to raise a triable issue of material fact that the amount of interest charged during any period of the loan exceeded 6.28%."

Based on the granting of summary judgment as to the only remaining cause of action, the trial court entered a judgment in favor of Wells Fargo on January 10, 2018. Simon timely filed a notice of appeal.

### *Attorney Fees*

In March 2018, Wells Fargo moved for $133,176.15 in attorney fees and costs. Simon opposed the motion. After hearing the matter, the trial court granted the motion and awarded $133,176.15 attorney fees and costs to Wells Fargo. Simon filed a timely notice of appeal from the postjudgment order granting attorney fees to Wells Fargo.

## DISCUSSION

## I

### *Excess Interest*

We begin by examining the scope of the argument framed by Simon's heading in which he asserts that "Wells Fargo breached Note A and Note B by charging interest in excess of the LIBOR benchmark rate, plus 1.03%." This argument heading suggests that Simon intends to explain how the interest collected by Wells Fargo exceeded the terms of the loan agreements. However, in the pages that follow under this argument heading, Simon provides no argument or case citation in an attempt to prove that Wells Fargo charged excess interest. For example, Simon does not explain what interest rate Wells Fargo actually charged or how the charged interest exceeded that specified in Notes A and B. Instead, Simon's argument under his first heading focuses on the alleged lack of disclosure by Wells Fargo and a lack of consideration in the ISDA confirmation letters and ISDA master agreement.

9

To the extent that Simon seeks reversal based on the argument that Wells Fargo charged excess interest, the claim is forfeited. "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3.) When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' (*Atchley v. City of Fresno* [(1984)] 151 Cal.App.3d [635,] 647; [citation].)" (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

## II

### *Breach of Duty to Disclose*

Simon argues that "Wells Fargo had a *legal duty* to disclose how the . . . swap transactions would affect Note A and Note B." (Italics added.) As we shall explain, we are not persuaded.

### A.

### *Review*

In reviewing Simon's challenge to the trial court's granting of summary judgment on his breach of contract claim, we apply the de novo standard of review. " 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]' (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843.) 'The court must "grant[]" the "motion" "if all the papers submitted show" that "there is no triable issue as to any material fact" [citation]—that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations]—and that the "moving party is entitled to a judgment as a matter of law." ' (*Ibid*., citing Code Civ. Proc., § 437c.) ' "Summary judgment is properly granted

10

when the evidence in support of the moving party establishes that there is no material issue of fact to be tried. [Citations.] The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. [Citation.]" ' (*Suzuki v. City of Los Angeles* (1996) 44 Cal.App.4th 263, 269.) 'As a corollary of the de novo review standard, the appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court. [Citation.]' (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1989) ¶ 8:168.5a, pp. 8-98.3 to 8-98.4 (rev. # 1, 2001).)" (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 21-22.)

**B.**

### *The Operative Complaint*

In arguing that the trial court erred in dismissing his cause of action for breach of contract, Simon emphasizes the following paragraphs in his operative complaint:

"20. Within a few days of [Simon] submitting the signed loan applications referred to above, [Wells Fargo's representative] Mr. Frost contacted [Simon] and stated he could obtain better interest rates and terms on the loans if the parties included Interest Rate Swap Transactions as part of the loans.

"21. [Simon] had no idea what or how an Interest Rate Swap Transaction worked or how it would affect any loan terms or the interest rates thereon that he may obtain from Wells Fargo. What [Simon] did know was that Mr. Frost represented to him that the interest rates on, and the terms of, the loans that were to be structured to include Interest Rate Swap Transactions would be better than the loans for which he had previously applied.

"22. Mr. Frost explained to [Simon] that he would get a fixed interest rate of 5.25% and then 'swap' that rate with an adjustable interest rate that was tied to LIBOR.

11

"23.  Mr. Frost explained to [Simon] that the LIBOR rate at that time was at about 5.25% and with Wells Fargo's fixed charge over the LIBOR rate, the adjustable interest rate for the first month of the loans would be less than the 6.3% fixed rate loans for which [Simon] had previously submitted his applications.

"24.  Mr. Frost further represented that the LIBOR rate was falling, that the economy was slowing and thus the LIBOR rate would continue to fall which would cause [Simon's] adjustable rate to fall as well.  [Simon] further pressed Mr. Frost to explain the 'swap' agreements.  The extent of Mr. Frost's further explanation was his raising of one hand and stating that if the LIBOR rate rose, then the adjustable rate would rise.  Mr. Frost lowered his other hand and said if the LIBOR rate fell, then the adjustable rate would fall.  Mr. Frost further explained that there would be a two point cap in the adjustable rate in either direction.

"25.  [Simon] is informed and believes that the interest rate calculations contained in the monthly billing statements to [Simon] did not rise above 7.25% and was within the 2 point cap as represented by Mr. Frost."

In granting summary judgment on the breach of contract cause of action, the trial court explained that it was "unable to find any allegations within the 2nd amended complaint . . . that [Wells Fargo] failed to make legally required disclosures related to swap transactions."  Thus, the trial court dismissed the claim of breach of the duty of disclosure as an unpleaded theory.

## C.

### *Implied Duty of Disclosure Under New York Common Law*

Simon's argument heading does not identify whether the alleged legal duty of disclosure arises under contract, statute, or case law.  Thus, we begin by examining the source of the legal authority on which Simon premises his argument.

Simon asserts that the ISDA confirmation letters and ISDA master agreement are governed by the laws of the State of New York. Wells Fargo agrees. The ISDA confirmation letters and ISDA master agreement confirm that New York law applies to the interpretation of these agreements.

In citing to the appellate record to support his argument, Simon refers to the statements made to him by a Wells Fargo employee as constituting the inadequate disclosure on which he bases his claim. Simon does not, however, purport to cite or quote any portion of the ISDA agreements. Thus, it appears that Simon's argument is not based on the assertion that Wells Fargo breached terms *in* the loan agreements. Simon also does not argue that Wells Fargo failed to provide him with copies of the loan agreements and documents.

It appears that Simon's argument is based on a duty of disclosure implied by New York State common law. Simon's argument primarily relies on *Procter & Gamble Co. v. Bankers Trust Co.* (S.D. Ohio 1996) 925 F.Supp. 1270 (*Proctor & Gamble*). In *Proctor & Gamble,* the federal district court applied New York State law to two interest rate swap agreements. (*Id.* at pp. 1274, 1275.) Simon quotes the portion of *Proctor & Gamble* in which the *Proctor & Gamble* court noted that "New York caselaw establishes an implied contractual duty to disclose in business negotiations. Such a duty may arise where 1) a party has superior knowledge of certain information; 2) that information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge." (*Id.* at p. 1290.) Accordingly, we consider whether New York common law implies a contractual duty of disclosure that was breached in this case by Wells Fargo because it had superior knowledge about the interest rate swap transactions. We also consider Simon's contention that Wells Fargo had a fiduciary duty to him as a consequence of its superior knowledge about the swap agreements.

Simon's operative complaint makes clear that the interest rate swap agreements were an arm's length transaction between two sophisticated actors. His operative

13

complaint acknowledges that Simon had made seven prior commercial loans with Wells Fargo before the loan agreements at issue in this case. The operative complaint further alleges that Simon already had loans in the amount needed for him to complete the purchase of the multimillion-dollar Golden Center Plaza when Wells Fargo offered the interest rate swap option.

The relationship between Simon and Wells Fargo was founded on a business relationship conducted at arm's length. Under this circumstance, New York law will not imply noncontractual duties of disclosure. "New York law is clear that the usual relationship of bank and customer is that of debtor and creditor." (*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, Nat. Ass'n* (2d Cir. 1984) 731 F.2d 112, 122.) Even a close debtor-creditor relationship does not establish a fiduciary duty that triggers a New York common law duty of disclosure beyond the terms of the agreement. (*Ibid.*; accord *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.* (2d Cir. 1984) 748 F.2d 729, 738-739.) Accordingly, we reject Simon's argument that Wells Fargo had a duty to educate him about the nature of interest rate swaps under a duty implied by New York State common law.

We reject Simon's assertion that New York law would imply disclosure obligations based on a fiduciary duty. Again, New York law would apply to Wells Fargo and Simon as parties to arm's length business transactions. " 'New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility and is founded upon trust reposed by one party in the integrity and fidelity of another. No fiduciary relationship exists . . . [where] the two parties were acting and contracting at arm's length. Moreover, courts have rejected the proposition that a fiduciary relationship can arise between parties to a business relationship.' " (*Procter & Gamble, supra,* 925 F.Supp. at p. 1289, quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.* (S.D.N.Y. 1985) 601 F.Supp. 770, 772.) As a result, the trial court correctly dismissed Simon's claim for breach of contract.

14

# III

## *Unilateral Mistake*

Simon next argues that "[t]he trial court erred in its summary judgment ruling when the court wrote that it was unable to find any allegations within the [operative complaint] that Simon was operating under a unilateral mistake as to the amount of the interest rates agreed to under the swap transactions."

## A.

## *Operative Complaint*

As with the allegation regarding lack of disclosure, the trial court found that Simon insufficiently pleaded "any allegations within the 2nd amended complaint that [he] executed all the documents related to the subject transaction while acting under a unilateral mistake as to what he interest rate agreed to due to a purported misrepresentation by Wells Fargo Bank concerning how the swap transaction affected the interest rates included in the notes . . . ." Simon refers to the same paragraphs in the operative complaint as we set forth in part II, B, above.

## B.

## *Unilateral Mistake*

Having acknowledged that New York State law governs his claims, Simon proceeds to cite California law to support his cause of action for breach of contract based on unilateral mistake. Under New York law, however, Simon's claim for rescission based on unilateral mistake cannot succeed. New York courts " 'have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party.' " (*In re Schenck Tours, Inc.* (Bankr. E.D.N.Y. 1987) 69 B.R. 906, 914.) Thus, unilateral mistake by itself does not provide a basis for relief. (*Kotick v. Shvachko* (N.Y.App.Div. 2015) 130 A.D.3d 472, 473 [14 N.Y.S.3d 8, 9].)

15

As one New York court explained, rescission is not warranted even when a "defendant has clearly shown that he signed the agreement with a mistaken notion of what it entailed [because] unilateral mistake alone is an insufficient basis for reformation or rescission (*Winant v. Winant* [(N.Y.App.Div. 1981)] 83 A.D.2d 849 [442 N.Y.S.2d 13], affd. [(N.Y. 1982)] 55 N.Y.2d 870 [433 N.E.2d 534]). ' "Mistake, to be available in equity, must not have arisen from negligence, where the means of knowledge were easily accessible" ' (*Da Silva v. Musso* [(N.Y. 1981)] 53 N.Y.2d 543, 551 [428 N.E.2d 382, 386], quoting *Grymes v. Sanders* (1876) 93 U.S. 55, 61 [23 L.Ed. 798, 801].)" (*Surlak v. Surlak* (N.Y.App.Div. 1983) 95 A.D.2d 371, 384 [466 N.Y.S.2d 461, 471].) Consequently, New York law affords Simon no relief based on his claim of unilateral mistake in failing to understand how interest rate swaps operate.

New York law recognizes that unilateral mistake may provide a sufficient basis for rescission when the mistake was induced by fraud. (*Kotick v. Shvachko* (N.Y.App.Div. 2015) 130 A.D.3d 472, 473 [14 N.Y.S.3d 8, 9].) Here, however, Simon has pleaded a cause of action for contract without also pleading the tort of fraud. (*But see Greene v. Rachlin* (N.Y.App.Div. 2017) 154 A.D.3d 814, 817 [63 N.Y.S.3d 78, 82] [holding that "a cause of action alleging fraud must be pleaded with specificity"].) For lack of pleading fraud by Wells Fargo, his cause of action for breach of contract was properly dismissed by the trial court. (*Ibid.*)

## IV

### *Lack of Consideration*

Simon argues that "the ISDA confirmation letters and ISDA master agreement are voidable for lack of consideration." The argument is forfeited.

Although Simon acknowledges that the ISDA agreements are governed by New York State law, he cites only California law without any contention that New York law is similar. In essence, he offers no legal authority in support of the claim of error under the

16

governing law.  Simon also does not offer a single record citation in support of his argument.  However, "[t]o demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record *that support the claim of error*.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3.) When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' (*Atchley v. City of Fresno* [(1984)] 151 Cal.App.3d [635,] 647; accord, *Berger v. Godden* [(1985)] 163 Cal.App.3d [1113,] 1117 ['failure of appellant to advance any pertinent or intelligible legal argument . . . constitute[s] an abandonment of the [claim of error]'].)" (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)  Accordingly, Simon's argument is deemed forfeited.

V

### *Breach of the Covenant of Good Faith and Fair Dealing*

Simon next argues that the "allegations [in his operative complaint] support the theory of breach of the implied covenant based on the non-disclosures of what swap transactions entail and how they operated to convert Simon's variable interest rate loans to fixed rate loans."  We reject the argument.

In his argument, Simon concedes that the operative complaint "does not specifically plead a cause of action for breach of the covenant of good faith and fair dealing."  However, " '[t]he pleadings delimit the issues to be considered on a motion for summary judgment.  [Citation.]' (*Turner v. State of California* (1991) 232 Cal.App.3d 883, 891 (*Turner*).)  Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98-99, fn. 4.)" (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th

17

1242, 1253.) Simon cannot establish that the trial court erred in dismissing the operative complaint based on an unpleaded cause of action.

We recognize that Simon argues that it is possible to scrutinize the record for an implied cause of action for breach of the covenant of good faith and fair dealing. Simon, however, does not provide any record citations in support of the assertion or any other part of the argument. We decline to search the record in support of this contention. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

## VI

### *Applicability of the Tender Rule*

Simon contends the trial court erred by sustaining the demurrer to his cause of action for wrongful foreclosure on grounds that he did not comply with the tender rule. He points out that the "trial court's analysis dismissed without any legal basis Simon's challenge to the amount of the debt. $817,797.60 is a significant challenge to the underlying debt." Thus, Simon concludes that "[t]he allegations within the [operative complaint] are sufficient to state a cause of action for wrongful foreclosure because Wells Fargo substantially overstated the amount due in violation of [Civil Code section] 2924, et seq. thus negating any futile obligation Simon may have to tender the overstated amount due."

The California Supreme Court has explained that, "[i]n reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42.) When a demurrer is sustained, we determine *whether the complaint states facts sufficient to*

18

*constitute a cause of action*. (See *Hill v. Miller* (1966) 64 Cal.2d 757, 759.) . . . The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, italics added.)

Simon's argument fails to mention or cite the operative complaint. However, to establish reversible error, Simon must demonstrate that *the operative complaint* set forth facts sufficient to state a cause of action for wrongful foreclosure. Simon does not show that his operative complaint alleges an offer of tender or futility that would excuse tender. (See *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062 [must plead tender or exception to rule requiring tender in order to state a cause of action for wrongful foreclosure].) Accordingly, he has not met his burden to demonstrate on the record that his operative complaint properly states a cause of action for wrongful disclosure. (*City of Lincoln v. Barringer, supra*, 102 Cal.App.4th at p. 1239, fn. 16.)

## VII

### *Attorney Fees*

Simon contends the trial court erred in awarding contractual attorney fees to Wells Fargo because (1) the parties' agreements do not provide for attorney fees under the circumstances of this case, (2) even if the agreements provided for attorney fees, the fee-shifting provisions did not extend to legal representation occurring after Well Fargo's foreclosure, and (3) Wells Fargo was not entitled to attorney fees relating to Simon's tort claims. We are not persuaded.

### A.

### *Order Awarding Attorney Fees*

The deeds of trust provide for attorney fees as follows: "5.6 Costs, Expenses and Attorneys' Fees. Trustor agrees to pay to Beneficiary immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including court costs and reasonable attorneys' fees (to include outside counsel fees and all allocated costs of

19

Beneficiary's in-house counsel), expended or incurred by Trustee or Beneficiary pursuant to this Article V,[4] whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Beneficiary or any other person) relating to Trustor or in any way affecting any of the Subject Property or Beneficiary's ability to exercise any of its rights or remedies with respect thereto."

The ISDA master agreement provides for fee shifting as follows: "11.  Expenses [¶]  A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection."

Simon also signed business loan confirmation letters that advised him:  "By signing below, Borrower acknowledges receipt of the Agreement, including the Disclosure and Related Documents, and agrees to the terms and provisions contained in them . . . ."  One of these documents, the business lending disclosure contains appendix A, which provides:  "Attorney's Fees and Expenses  [¶]  You agree to pay upon demand all of Bank's costs and expenses incurred in connection with the enforcement of the Bank's rights  regarding your obligations under the Agreement, including attorney's fees, Bank's legal expenses, amounts paid to third parties that assist Bank in such enforcement efforts, and any other costs and expenses of such enforcement efforts.  Costs and

---

**4**    Article V addresses "default provisions" in the event that the borrower does not perform an obligation under the deed of trust.  The deeds of trust mix roman numerals and arabic numerals in numbering sections of the agreements.

20

expenses include, among other things, Bank's attorney's fees (outside counsel fees as well as allocated costs of Bank's in-house counsel), and legal expenses whether or not there is a lawsuit, including attorney's fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, to the extent allowed by applicable law."

The trial court awarded $133,176.15 in contractual attorney fees and court costs to Wells Fargo. In awarding fees and costs, the trial court found that Simon executed business confirmation letters for the loans. The business confirmation letters referred to the business lending disclosure, which contained the fee shifting provision that the trial court relied upon in awarding fees.

## B.

### *Contractual Attorney Fees*

As a general rule, New York law disallows a prevailing party from recovering attorney fees "unless an award is authorized by agreement between the parties, statute or court rule." (*Hooper Associates, Ltd. v. AGS Computers, Inc*. (N.Y. 1989) 74 N.Y.2d 487, 491 [548 N.E.2d 903, 904].) However, fee-shifting clauses in contracts under New York State law may provide broadly for fees – including contractual and tort claims. (*Frankel v. Vernon & Ginsburg*, LLP (N.Y.App.Div. 2018) 160 A.D.3d 528, 529 [75 N.Y.S.3d 158, 160] (*Frankel*), citing *GoTek Energy, Inc. v. SoCal IP Law Group, LLP* (2016) 3 Cal.App.5th 1240, 1250 [holding that parties to a contract may agree that the prevailing party in litigation receive attorney fees regardless of whether the claims arise in tort or contract].) Thus, reasonable attorney fees may be recovered for all claims encompassed within a fee-shifting term. (*Klapper v. Graziano* (N.Y.Sup.Ct. 2013) 970 N.Y.S.2d 355, 363, affd. (N.Y.App.Div. 2015) 129 A.D.3d 674 [10 N.Y.S.3d 560] (*Klapper*).)

In reviewing an argument that attorney fees were not authorized by agreement of the parties, we apply the independent standard of review. (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336.) We strive to determine the intent of the parties when we construe the terms of the contracts between the parties. (*Id.* at p. 1337.) We read the contracts as a whole and give words their plain and ordinary meaning. (*Ibid.*; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 814.)

In this case, the parties agreed to multiple fee-shifting provisions. We conclude that more than one fee-shifting provision supports the trial court's award of attorney fees. First, the deeds of trust provided for attorney fees at the trial and appellate levels for claims "in any way affecting any of the Subject Property or [Wells Fargo's] ability to exercise any of its rights or remedies with respect thereto." The action brought by Simon against Wells Fargo directly related to the properties subject to the deeds of trust and Wells Fargo's efforts to enforce the debt obligations on the properties. Consequently, Wells Fargo was entitled to its fees incurred in enforcing the debts.

We reject an interpretation of paragraph 5.6 in the deeds of trust that would limit attorney fees only to those incurred in connection with bankruptcy. The language and punctuation of the clause regarding bankruptcy makes clear that the attorney fees term encompasses efforts to enforce the debt obligations *and* those relating to bankruptcy. Thus, the paragraph states that attorney fees are recoverable for enforcement, "*and including* any of the foregoing incurred in connection with any bankruptcy proceeding . . . ." (Italics added.) Thus, the bankruptcy clause was intended to add a circumstance in which fee-shifting applied rather than to restrict the availability of fees to bankruptcy related legal work.

Simons asserts that he did not bring this action to enforce the deeds of trust or unwind the foreclosures. The focus, however, is on whether Wells Fargo's attorney fees were incurred in enforcing the debt obligations or defending the foreclosure. The attorney fee provision provides for recovery of Well Fargo's efforts to enforce the debt

22

obligations and defend the foreclosure. Plainly, Wells Fargo did so. Wells Fargo argued that it charged the correct amount of interest under the debt instruments and that Simon's wrongful foreclosure claim was not viable. These efforts squarely fell within the attorney fee provisions of the deeds of trust.

These legal efforts to enforce the debt instruments and defend against the claim of wrongful foreclosure were also recoverable under the provisions of the ISDA master agreement. The ISDA master agreement provided that a defaulting party will pay to Wells Fargo "all reasonable out-of-pocket expenses, *including legal fees . . .* , incurred by such other party by reason of the enforcement and protection of its rights under this Agreement . . . ." Wells Fargo's defense was founded on the protection of its rights to repayment of interest and principal for the loans it made to Simon before he defaulted on payment. Accordingly, the ISDA master agreement also provides for attorney fee shifting in this case.

Simon argues that the fee-shifting provision in appendix A of the business lending disclosure is insufficiently incorporated by the other loan documents to be effective. Regardless of whether appendix A applies and provides for fee shifting, the deeds of trust and ISDA master agreement each support the attorney fees awarded to Wells Fargo. Accordingly, we conclude that fee-shifting clauses contained in agreements by the parties provided for recovery of attorney fees.

## C.

### *Whether Attorney Fees are Recoverable for Defense of Simon's Tort Claims*

Simon argues that the contractual attorney fee provisions in the parties' agreements do not allow for recovery of legal fees incurred in defense of his tort claims. Simon urges us to reverse the trial court's award of attorney fees insofar as they might include legal work related to the defense of his claims of concealment and wrongful foreclosure. We disagree.

23

Under New York law, an agreement to be responsible for " 'any attorneys' fees incurred by Company in connection with any claim or lawsuit brought in violation' " of an agreement provides for attorney fees on tort claims. (*Klapper, supra,* 970 N.Y.S.2d at p. 363.) And, as in *Frankel*, the fee shifting provisions in this case are written broadly to encompass contractual and tort causes of action. (*Frankel, supra,* 75 N.Y.S.3d at p. 160.)

The fee-shifting provisions in the deeds of trust and ISDA master agreement do not restrict fees to contract claims only. Instead, the deeds of trust broadly extend to Wells Fargo's "ability to exercise any of its rights or remedies with respect thereto" payments under and enforcement of the debt instruments. Likewise, the ISDA master agreement authorizes recovery of legal fees arising out of "enforcement and protection of [Wells Fargo's] rights under [the ISDA] [a]greement[s]." Wells Fargo protected its rights under the agreements by defending against Simon's claims of concealment and wrongful foreclosure. Thus, the trial court did not err in awarding attorney fees including those incurred in Wells Fargo's defense against Simon's tort claims.

## DISPOSITION

The judgment and the postjudgment award of attorney fees are affirmed. Wells Fargo shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/
HOCH, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
MAURO, J.

24